Lisa Marie MAZUR, a Minor, in her own right, and Anthony Mazur and Edna Mazur, as Parents and Guardians, and in their own right

v.

MERCK & CO., INC.

Civ. A. No. 85–6494.

United States District Court, E.D. Pennsylvania.

June 27, 1991.

---

David R. Dearden, Sprague, Higgins, Creamer & Sprague, Philadelphia, Pa., for plaintiff.

Kenneth C. Frazier, Joanne Lahner, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

In this case, a manufacturer is charged with failing to warn that the use of its vaccine might lead to serious consequences. Before me is the supplemental motion of defendant Merck & Co., Inc., for summary judgment and to exclude expert testimony.[1] Plaintiffs Lisa Marie Mazur and her parents, Anthony and Edna Mazur, claim that Lisa contracted subacute sclerosing panencephalitis ("SSPE"), a severe, often terminal, illness of the central nervous system, as a result of an inoculation with a measles, mumps, and rubella vaccine ("MMR II") manufactured by Merck.

Merck's first motion for partial summary judgment was denied in part and granted in part. *Mazur v. Merck*, 742 F.Supp. 239, 266 (E.D.Pa.1990). I denied Merck's motion as to the federal preemption and statute of limitations issues. *Id.* After a lengthy discussion of the many other matters raised by the parties, I found that additional discovery and briefing was necessary and gave the parties time to conduct both. *Id.* Specifically, I invited the parties to address whether or not:

a. Merck acted in accordance with due care when it contracted with the Center for

---

1. At oral argument, Merck withdrew that portion of its motion concerning expert testimony and causation. Merck had argued plaintiffs' experts' testimony on the causal relationship between its vaccine and Lisa Mazur's illness was not supported by the medical literature and did not create a genuine issue of material fact as to causation. Merck reserved the right to re-argue that point. Plaintiffs have withdrawn their claims that Merck's vaccine was defectively designed and manufactured. Merck had previously moved for summary judgment on those claims. The motion is moot as to them. Merck also asserted that the Mazurs have not shown and could not prove the proximate cause element of a duty to warn claim. That issue has been fully briefed by the parties. However, I will not express an opinion on that point as it is unnecessary to do so because the motion will be granted on other grounds.

Disease Control ("CDC") to ensure the presence of a physician at inoculation or an adequate warning of the risks associated with vaccination was conveyed to recipients or to their parents or guardians, *id.* at 261;

b. the school nurse who supervised the MMR II inoculation was a learned intermediary, *id.* at 255;

c. the package circular contained an adequate warning of the revaccination risks, *id.* at 258;

d. the proximate cause element of a duty to warn claim had been satisfied,[2] *id.* at 262–63; and

e. the cause-in-fact element of a duty to warn claim had been satisfied,[3] *id.* at 266 and n. 33.

Merck's supplemental motion for summary judgment will be granted. Merck satisfied its duty to exercise reasonable care to inform the Mazurs of the vaccine's risks. Even though no doctor was present, Edith Frederick, the nurse who supervised the administration of the vaccine to Lisa Mazur, was a qualified learned intermediary. She was provided with a sufficient warning of the risks associated with MMR II inoculation. The package circular contained an adequate warning of vaccination risks and accurately reflected the medical evidence available in 1982. Therefore, Merck cannot be held liable for Lisa's illness.

## I. Facts

The facts of this case are described in great detail in my prior opinion. *See Ma-*

*zur*, 742 F.Supp. at 243–45. I will briefly summarize them here.

In response to a measles epidemic among school children in Philadelphia in the late 1970's, the City of Philadelphia, Department of Public Health ("health department") proposed a regulation, which was later adopted by the School Board of Health ("school board"), requiring all children attending a school in Philadelphia to be vaccinated against a variety of pediatric diseases. The school board's medical director, Dr. Robert G. Sharrar, selected Merck's MMR II vaccine for the simultaneous immunization against measles, mumps, and rubella. Affidavit of Robert G. Sharrar, M.D., ("Sharrar aff."), ¶ 8, attached as Merck's exhibit J.

MMR II was packaged in containers which included an insert describing the risks and benefits associated with its use.[4] The school board purchased the MMR II vaccines from the CDC which had, in turn, purchased them from Merck. The Merck–CDC purchase contract stated the CDC would assure that a physician be present at each inoculation or that the CDC would provide MMR II recipients or their parents with what Merck and it believed to be an adequate warning of the risks associated with MMR II immunization. Opting to proceed under the latter clause, the CDC drafted an "Important Information Statement" to be sent to all parents of school-age children. Affidavit of William B. Freilich, ("Freilich aff."), ¶ 22 and exhibit 6, attached as Merck's exhibit E. The Important Information Statement was sent to parents via their children.

---

**2.** As I pointed out above, at 698 n. 1, the proximate cause question will not be reached in this opinion.

**3.** Merck opted to reserve its challenge to the sufficiency of the Mazurs' proof of causation until a later date. *See supra* at 698 n. 1.

**4.** The April, 1981, package insert or circular contained the following pertinent information about the risk of contracting SSPE from the MMR II vaccine:

There have been reports of subacute sclerosing panencephalitis (SSPE) in children who did not have a history of measles but did receive measles vaccine. Some of these cases

may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccination distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5–10 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study conducted by the Centers for Disease Control suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent risk of SSPE.

Lisa Mazur received the MMR II vaccine on February 26, 1982. The vaccine was administered at Lisa's school under the supervision of Edith B. Frederick, a registered nurse. Mrs. Mazur claims she never gave her consent for her daughter's vaccination. She denies receiving an Important Information Statement or any other warning about MMR II's risks. She did, however, become aware of the scheduled immunization, protested Lisa's vaccination to the school board, and so she would not be vaccinated kept Lisa out of school for a week prior to the date of the vaccination.

On November 2, 1983, Lisa was diagnosed as having SSPE.[5]

## II. Duty to Warn

### A. The Manufacturer's Duty to Warn.

In my prior opinion in this case, I described and explained the nature and scope of a vaccine manufacturer's duty to warn. *See Mazur,* 742 F.Supp. at 251–53. I need not go into such a thorough review here, but a few comments are necessary.

■ The standard of care which applies in this case is set forth in Restatement (Second) of Torts § 388.[6] "Under this section, the supplier has a *duty to exercise reasonable care* to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d

206, 219 n. 9 (1971) (emphasis added). Because MMR II is a prescription drug product, Merck can satisfy its duty to warn the vaccine recipient by exercising reasonable care to provide an adequate warning to a medical professional who acts as a "learned intermediary." *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). The "learned intermediary rule" recognizes that a medical professional is qualified by knowledge, experience, and preparation to exercise his "individual medical judgment bottomed on a knowledge of both patient and palliative." *Id.*

■ If the vaccine is "dispensed to all comers at mass immunization clinics without an individualized balancing by a physician of the risks involved ..., [i]t is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or by obligating the purchaser to give warning." *Davis v. Wyeth Laboratories,* 399 F.2d 121, 131 (9th Cir.1968). Although this principle has been called the "mass immunization exception" to the learned intermediary rule,[7] *see, e.g., Hurley v. Lederle Laboratories,* 863 F.2d 1173, 1178–79 (5th Cir.1989), it is really one of several circumstances when the duty to warn the user directly is imposed on the manufacturer.

---

5. SSPE is a slowly progressing, inflammatory disease of the central nervous system. SSPE most often attacks children under twenty years of age. Its onset is marked by mental deterioration and psychological disturbances. Neurological and motor dysfunctions, such as convulsions, seizures, visual difficulties, and myoclonic jerks, are often present. Death usually occurs within one to three years. *See, e.g., The Merck Manual,* 2041 (Merck Sharp & Dohme Research Laboratories, 15th ed. 1987); *Harrison's Principals of Internal Medicine,* 2096 (R. Petersdorf, 10th ed. 1983). Lisa is still alive, but is presently incapacitated.

6. Section 388 provides in pertinent part:
   One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a

person for whose use it is supplied, if the supplier
   (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
   (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
   (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

7. I found previously that mass immunization principles did not apply in this case because the health department program was not a "mass immunization," the vaccine was not dispensed to "all comers," individualized medical judgments were made that excluded two-thirds of the potential recipient pool, and Merck could not have foreseen that no learned intermediary would be present at inoculations. *Mazur,* 742 F.Supp. at 255–57.

If the manufacturer chooses to obligate the purchaser of the vaccine to give warning, permissible under *Davis* and comment n of section 388, the general rule controls and the manufacturer's warning activities must be examined to see if they comport with its "duty to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." *Incollingo*, 282 A.2d at 219 n. 9. The issue of whether or not the reasonableness standard has been met will most likely turn on the issue of foreseeability, (*i.e.*, "was it foreseeable that the purchaser would not provide an adequate warning to the consumer?" or "was it foreseeable that a learned intermediary would not be present at inoculation?"). If the manufacturer acts in accordance with due care it cannot be liable for the injuries that happen to befall the plaintiff.

### B. The Parties' Contentions.

The Mazurs charge Merck with failing to warn them of MMR II's risks before Lisa was inoculated. They allege that they never received any warning from Merck, the CDC, the health department, or the school board. The Mazurs posit claims for strict liability and negligence for failure to warn. These claims depend on proof of four facts: (1) Merck had a duty to warn adequately Lisa or her parents or a learned intermediary of the health hazards associated with MMR II use; (2) Merck breached that duty; (3) Merck's breach in fact caused Lisa's illness;[8] and (4) Merck's breach proximately caused her illness.[9]

Merck argues it had no duty to warn the Mazurs directly and it fulfilled its duty to warn by entering into and relying on its purchase contract with the CDC. It contends its transactions with the CDC were in accordance with its "duty to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." *Incollingo*, 282 A.2d at 219 n. 9. Merck also asserts it did not have a duty to warn Lisa or her parents directly, because Nurse Frederick was qualified and in fact acted as a "learned intermediary," *Reyes*, 498 F.2d at 1276, at the time Lisa received the MMR II inoculation. Thus, Merck argues it need only have made an adequate package circular available to Nurse Frederick. It posits that it has done so. Additionally, it also maintains that the Mazurs' contention that the revaccination warning was inadequate is without merit.

With that background in mind, I will first discuss whether Merck acted in accordance with due care when it contracted with and relied upon the CDC to provide a physician or the Important Information Statement to parents. It did. I will then consider whether or not Nurse Frederick was a learned intermediary. She was. Because she was, I will next address whether a warning was made available to her. It was. Finally, I will analyze whether the package circular contained an adequate warning of the revaccination risks. It did. Thus, Merck is entitled to summary judgment in its favor.

### III. Discussion

#### A. Merck Discharged its Duty to Warn Through the CDC Contract.

Merck is not responsible for Lisa's injuries if it acted reasonably when it contracted with the CDC and relied upon its guarantee that the MMR II vaccine would be administered by a physician or after a meaningful warning had been provided to Lisa or her parents. *Mazur*, 742 F.Supp. at 260–61.

In the mid–1970's, following *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir.1968), and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), Merck reconsidered its vaccine distribution policies. Freilich dep. at 109. With these mass immunization decisions, the courts had created the possibility for expanded liability, but they had given Merck an out by permitting it to assign warning tasks to an intermediate purchas-

---

**8.** *See supra* at 698 n. 1.

**9.** *See supra* at 698 n. 1.

er. *Davis*, 399 F.2d at 130; *Reyes*, 498 F.2d at 1276–77. William Freilich, Merck's in-house counsel at the time, focused on the latter. He saw a way for "Merck to limit its liability exposure based on the *Reyes* case." Freilich dep. at 109. He proposed Merck, other vaccine manufacturers, CDC representatives, the Immunization Practices Advisory Committee ("ACIP"), the Bureau of Biologics, the Food and Drug Administration, the Committee on Infectious Diseases of the American Academy of Pediatrics ("Redbook Committee"), state public health departments, and representatives of parent and consumer groups meet to discuss alternatives programs. *Id.* at 23. At the meeting, three alternatives were suggested. *Id.* at 109–10.

The first proposal was to require manufacturers to be responsible for vaccine administration throughout the country. *Id.* at 23 and 107. According to Freilich, this "ridiculous" idea was dismissed rather readily because none of the manufacturers had any experience in public health administration issues and there were a wide variety and large number of public health agencies and experts in a better position to deal with large-scale immunization. *Id.* at 24 and 107–08.

The second suggestion, one that was adopted by all of the participants at the meeting, was to lobby for the establishment of a no-fault compensation fund for children injured as a result of immunizations. The National Childhood Vaccines Injury Act of 1986, 42 U.S.C. §§ 300aa–33, was the product of this legislative initiative. *See Mazur*, 742 F.Supp. at 246–47.

The third alternative, one that was adopted by Merck and the CDC, was to require the CDC, as the primary purchaser of Merck's MMR II vaccines, to disseminate warnings to individuals who would receive the vaccine as part of a public health program. Freilich dep. at 143. Freilich talked to each of the participants at the meetings before he made his determination that the Merck–CDC purchase contract was the best means to ensure that a warning was provided to vaccine recipients in order to limit Merck's liability exposure. *Id.* at 143–49.

To that end, in the late 1970's and early 1980's, Merck and the CDC entered into three contracts for the sale and purchase of MMR II. The Merck–CDC purchase contract provided in pertinent part that the CDC:

represents and agrees that it will (1) take all appropriate steps to assure that all vaccine supplied to various locations within the 50 states, ... pursuant to the terms of this contract, shall be administered to each patient on the basis of an individualized medical judgment by a physician, or (2) take all appropriate steps to provide to such a patient (or to the patient's parent or guardian) meaningful warnings relating the risks and benefits of vaccination, in form and language understandable to such patient, parent or guardian.

Freilich aff. at ¶ 17 and exhibits 3, 4, and 5 attached thereto. Freilich drafted most of the "duty to warn clause," Freilich dep. at 177, but both Merck and the CDC negotiated the contract, *id.* at 178–79, and the CDC made proposals which were eventually included in the final document, *id.* at 183–84.

Soon after entering into the contracts, the CDC set out to draft a comprehensible, yet substantively adequate warning for vaccine recipients or their parents.[10] The Important Information Statement was intended to serve that purpose. The CDC drafted an Important Information Statement for all the vaccines it provided to local public health agencies. For its sources for

---

**10.** The CDC never proceeded on a plan to ensure the presence of a physician at each inoculation. It selected the alternative route and required local health agencies to use the Important Information Statement. If, like here, the local health agency required a learned intermediary to be present at inoculation, the vaccine manufacturer cannot be held liable even if the local health agency or the CDC failed to disseminate the Important Information Statement. In other words, even though the Merck–CDC contract called for the CDC to ensure that a physician would be present at each inoculation—and even though that was not done so far as Lisa Mazur was concerned—the presence of a learned intermediary, Nurse Edith Frederick, *see infra* at 708–711, precludes imposing responsibility for Lisa's ensuing illness on Merck.

the measles, mumps, and rubella Important Information Statement, the CDC used Merck's MMR II package circular, previous CDC studies, and its own general expertise in the fields of vaccine safety and administration. Freilich aff. at ¶¶ 24–25. Merck did not materially participate in the preparation of the Important Information Statement, except for providing the CDC with the package circulars. Freilich aff. at ¶ 25.

The CDC obligated, as a condition of purchase, the state and local health agencies, such as the health department, to provide vaccine recipients or their parents with the appropriate Important Information Statements. Freilich aff. at ¶ 22; Childhood Immunization Project Grants: Guidelines for Applications, February, 1980, at 10.[11] The health department distributed the Important Information Statements during the 1981–82 immunization program.[12] Deposition of Herbert Hazan, at 25–26, attached as Merck's exhibit F.

The Mazurs charge it was not reasonable for Merck to rely on the CDC because: (1) Merck was improperly motivated to do so; (2) Merck knew the difficulty in drafting an adequate warning directed to the recipient or her parents; (3) Merck knew the CDC would draft an Important Information Statement which downplayed the real risks of MMR II inoculation in order to increase the number of recipients; (4) Merck knew earlier versions of the Important Information Statement were sometimes not read or not understood by the recipient or her parents; and (5) Merck failed to investigate initially and to monitor continually the CDC's performance under the contract. Merck contends it contracted with the CDC, after careful negotiation and planning, because the CDC was in the best position to provide vaccine recipients with a meaningful warning and it had no reason to doubt that the CDC would not do so. I conclude Merck acted in accordance with its duty of care and the Mazurs' arguments to the contrary must be rejected.

### 1. Merck's motivation is irrelevant.

The Mazurs charge Merck with unreasonable conduct because of its attempt "to limit its liability exposure." Freilich dep. at 109. The Mazurs assert "that the impetus for these meetings was not to devise the best method for warning the public of vaccine risks, but to devise a way for Merck and other vaccine manufacturers to continue to market vaccines, while at the same time insulating themselves from the specter of liability raised by the *Reyes* case." Mazurs' resp. at 18. I will assume this is so, despite the absence of proof that it is. There is no requirement, however, that Merck be an altruist before it can avoid liability. If that were the case, Merck should be blamed for charging the CDC for the vaccines—it should have provided them free. Merck is permitted, under the very decision the Mazurs assert prompted this allegedly unscrupulous behavior, to obligate a third party to carry out its warning tasks. *Reyes*, 498 F.2d at 1276. That Merck may have done so to limit its liability exposure rather than for altruistic or humanitarian reasons is of no consequence.

If the Mazurs' argument is taken to the extreme, few suppliers could ever escape liability for the injuries which their products cause, because most suppliers act with a profit motive rather than with an altruis-

---

**11.** The Guidelines provide:
VI. USE OF INFORMATION STATEMENTS ON RISKS AND BENEFITS OF VACCINATION
A. In order to assure appropriate provision of information relating to risks and benefits of vaccination in programs for which funds are made available pursuant to this grant, grantees shall take the following steps:
1. Establish procedures for providing copies of the appropriate "Important Information" forms ... to all vaccinees (parents or guardians) receiving vaccinations in public clinic settings.... Any other addition to the forms, or variation from the language or format of them, must have prior written approval of the [CDC].

**12.** In the first round of motions, the Mazurs argued the fact that Mrs. Mazur never received an Important Information Statement from the health department showed that Merck acted unreasonably in relying on the CDC to provide a warning to her. *Mazur*, 742 F.Supp. at 261. I rejected this argument because the relevant issue is not whether she actually got an Important Information Statement, but whether Merck could foresee she would not get one. *Id.*

tic one. Limiting liability exposure is one way of maintaining whatever profit sales create. I am certainly not prepared to foist liability onto every manufacturer, distributor, or retailer because it acts in its own self-interest; any warning, whether provided by Merck or the CDC, was intended to limit Merck's liability. Merck could supply its vaccine products without a warning, and face devastating consequences in the form of law suits and criminal sanctions. A warning limits the chance such things might happen. Merck's motivation in relying on the CDC is not relevant to the issue of whether Merck acted in accordance with due care.

### 2. Merck reasonably relied on the CDC to draft the Important Information Statement.

The Mazurs' second argument focuses on Merck's unsuccessful attempt to draft a package circular which could be understood by patients. They argue since Merck knew it was very difficult to create such a warning, it should have known the CDC would not be up to the task. Essentially, they charge if Merck knew creating an understandable warning was hard, it acted unreasonably when it required the CDC to come up with one.

This argument relies on a mischaracterization of Freilich's deposition testimony. Freilich freely admitted Merck had tried and failed to develop a *"package circular"* that would be comprehensible to vaccine recipients or their parents. Freilich dep. at 120, 123–25, 127–33, 135–36, and 140–41. Freilich also stated, however, a *"consent form"* or an *"important information form"* can be written for lay understanding. *Id.* at 135. The Mazurs glide over the highlighted terms and attempt to equate them. Freilich explained that a "patient package circular," *id.* at 140, was different than an important information form in that a patient package circular must contain "all recommendations and knowledge that a manufacturer feels is relevant and important to accompany its product, and ... required ... by the Federal Government.... And that package circular is required to accompany the product

when it's sold in interstate commerce." *Id.* at 136. Clearly, what Freilich was talking about was a document that complied with all the requirements of federal drug regulations and was still comprehensible to a lay person. Merck found the terms required under federal law to be too technical to be explained in ordinary language. *Id.* at 140–41. Merck was also concerned about the possibility the patient package circular would not reach the patient because it would be placed in the vaccine container which is often not made available to the patient. *Id.* at 142. In light of these facts and given Merck's belief that a comprehensible warning, not necessarily a patient package circular, could be drafted, it was reasonable to assign the task of creating and disseminating a separate document, the Important Information Statement, to the CDC.

### 3. The CDC did not downplay the risk.

The Mazurs' next contention is the most specious. Basically, they charge Merck should not have trusted the CDC, because Merck knew or should have known the CDC willfully downplays the risks inherent in MMR II vaccination in order to entice children into receiving the vaccine. This contention must be rejected for a number of reasons.

First, the Important Information Statement does not downplay the risks associated with MMR II inoculation. The October 1, 1980, Important Information Statement, the one used in the 1981–82 immunization drive, carefully and clearly describes the grave dangers which could result from measles, mumps, and rubella. Then, it explains who should receive the correlating vaccines. The side effects of the vaccines are stated:

About 1 out of every 5 children will get a rash or slight fever 1 or 2 weeks after getting measles vaccine lasting for a few days. Occasionally there is mild swelling of the salivary glands after mumps vaccination. Although experts are not sure, it seems that very rarely children who get these vaccines may have a more serious

reaction, such as inflammation of the brain (encephalitis), convulsions with fever, or nerve deafness.

About 1 out of every 7 children who get rubella vaccine will get a rash or some swelling of the glands of the neck 1 or 2 weeks after the shot. About 1 out of every 20 children who get rubella vaccine will have some aching or swelling of the joints. This may happen anywhere from 2 to 10 weeks after the shot. It usually lasts 2 or 3 days. Adults are more likely to have these problems with their joints—as many as 1 in 4 may have them. Other side effects, such as pain, numbness, or tingling in the hands and feet have also occurred but are very uncommon.

With any vaccine or drug, there is a possibility that allergic or more serious reactions or even death could occur.

A warning which plainly states that encephalitis, convulsions with fever, nerve deafness, serious reactions, or death may follow immunization is not what a reasonable juror would call "downplaying" a vaccine's risks. Those warnings were accurate given the state of medical knowledge in 1982, *see infra* at 40–45, and were in a form and in terms the intended reader would understand. Had a vaccine recipient and his parents read the Important Information Statement, they would have understood the real risks associated with MMR II inoculation.

The Mazurs, through their expert Dr. Kevin C. Geraghty, contend that there were five inadequacies, *i.e.*, areas in which the CDC downplayed the true risks, in the 1980 Important Information Statement which made Merck's reliance on the CDC unreasonable [13]:

1. the term encephalitis is not properly described;

2. a proper revaccination warning is not included;

3. certain possible side effects of the measles vaccine, such as permanent brain damage, blindness, and/or death, are not listed;

4. recipients should have been warned to defer vaccination until after consultation with a physician if they had been hospitalized within the previous 90 days; and

5. recipients should have been warned to defer vaccination until after consultation with a physician if they had recently received prescription medication.

Affidavit of Kevin C. Geraghty, ("Geraghty aff.") at ¶ 35, attached as Mazurs' exhibit 57. These alleged deficiencies in the Important Information Statement are without merit. Except for the revaccination complaint, which I will discuss and reject in the package circular portion of this opinion, *infra* at 40–45, I will consider these allegations in turn.

First, the encephalitis charge: it is important to note that the term encephalitis is used to further specify the lay description "inflammation of the brain." Thus, Dr. Geraghty's accusation is calculated to mislead since the term encephalitis is in and of itself a description of a condition. More significant is the fact that encephalitis is defined in *Dorland's Illustrated Medical Dictionary*, 483 (24th ed. 1965) as "inflammation of the brain." Dr. Geraghty's complaint is disingenuous. It is difficult to understand how the term encephalitis could be better described to a layman than by its definition. Certainly, there are types of encephalitis, SSPE, for example, which could have been listed but that would not have aided the lay reader because she would not understand what the terms meant. "Inflammation of the brain" adequately describes and defines encephalitis

[13]. The Mazurs cogently argue that the language of the Important Information Statement is relevant to whether Merck exercised reasonable care to inform them of the risks of MMR II inoculation, because, for example, if Merck had authorized the CDC to disseminate the Important Information Statement in Latin, as opposed to English, with the knowledge that very few people understand Latin, that would not be in accordance with due care. Similarly, it would not be reasonable for a manufacturer to ask a delivery company if its trucks were safe when it knew that the drivers of the trucks were blind, and then nonetheless award a delivery contract to the delivery company. Therefore, I will examine the Important Information Statement to determine if Merck acted reasonably when it relied upon the CDC to issue it.

for the intended reader of the Important Information Statement.

I agree that the Important Information Statement does not use the words "brain damage" or "blindness," but the clear impression it leaves is that these medical problems could result from the inoculation. "Inflammation of the brain" describes damage to the brain, death is listed as a possible consequence of immunization, and although blindness is not among the warnings, it is encompassed in the unspecified "serious reaction" category. Even if blindness could not be so included, Dr. Geraghty does not identify any medical research that would support the inclusion of the term in the Important Information Statement.[14]

The ninety-day and prescription drug limitations are similarly unsupported by the medical evidence available in February, 1982. Dr. Geraghty does not refer me to a single article predating 1982 that concludes the physical health of the vaccine recipient is a causative factor in the onset of illness following measles, mumps, and rubella vaccination. Dr. Geraghty also does not explain what the problem is with the Statement's warning that:

**SOME PERSONS SHOULD NOT TAKE THESE VACCINES WITHOUT CHECKING WITH A DOCTOR:**

\* Those who are sick right now with something more serious than a cold.

\* Those with an allergy to an antibiotic called neomycin.

\* Those with cancer or leukemia or lymphoma.

\* Those with diseases that lower the body's resistance to diseases.

\* Those taking drugs that lower the body's resistance to infection such as cortisone or prednisone.

\* Those who have received gamma globulin within the preceding 3 months.

(emphasis in original). These warnings adequately apprise the vaccine recipient or his parents that the physical health of the recipient at the time of and immediately before the inoculation is an important factor in the immunization determination, one that should be analyzed by a medical professional. In sum, there is nothing about the wording of the Important Information Statement which made its use by the CDC and Merck unreasonable.

Second, were I to accept the argument that Merck knew or should have known the CDC would mislead children and their parents about the risks inherent in MMR II inoculation to increase the number of vaccinations, I would have to find the very agency created to promote and to protect the public welfare cannot be trusted. The Mazurs provided me with no reason to do so. The CDC is an agency of the Public Health Service of the United States Department of Health and Human Services. It is empowered to conduct studies, evaluations, tests, and emergency programs in order to prevent the spread of disease and to improve public welfare. With respect to vaccines, it plays a vital role in research, development, testing, and distribution. 42 U.S.C. § 300aa–2; Freilich aff. at ¶ 9. It publishes the *Morbidity and Mortality Weekly Report,* among other reports, studies, and journals, to educate public health and medical professionals about the risks and benefits of immunization. Freilich aff. at ¶ 11. One of its more important functions is to provide financial and medical assistance to state and local health agencies, such as the health department, so they can operate immunization programs. It performs that function to increase the number of vaccine recipients, because that makes for a healthier populace. There is nothing improper with this goal and there is no evidence from which I can conclude the

---

**14.** Dr. Geraghty relies, in part, I assume, on Kazarian, *Optic Neuritis Complicating Measles, Mumps, and Rubella Vaccination,* 86 American Journal of Ophthalmology 544 (1978), to support his opinion. That article, however, merely concludes there is a possible relationship between the trivalent measles, mumps, and rubella vaccine and optic neuritis. The patient which the article describes was temporarily without sight in his left eye and that eye was to some degree impaired for over a year. Optic neuritis is an inflammation of the optic nerve. A possible correlation between the vaccine and optic neuritis would not create the necessity of a special warning for possible blindness in light of the other serious side effects described within the Important Information Statement.

CDC sought to achieve this goal by lulling potential recipients into a false sense of security about the risks of immunization. The Mazurs have not offered a shred of proof the CDC ever intentionally falsified a warning, left out a key warning, encouraged certain individuals to receive the vaccines without the benefit of a physician's counsel, artificially inflated the efficacy and safety of immunization, or did anything that would create an unnecessary risk of harm to potential vaccine recipients.[15] Merck could rely on the CDC to carry out its public health functions without fear the CDC would downplay MMR II's hazards to place individuals like Lisa Mazur in a position to receive it when they should not.

### 4. The statement-comprehension study imposed no duty on Merck.

In 1977, the CDC conducted a study of lay comprehension of the various Important Information Statements it used to warn vaccine recipients. Mazurs' exhibit 47, a memorandum from Alan R. Hinman, M.D., Director, Immunization Division of the CDC ("Hinman memo."). Test subjects were provided with the Important Information Statements for five childhood vaccines: DTP, polio, measles, mumps, and rubella. The results of the study were not particularly encouraging, because those who read the Important Information statement did not always understand it.[16] Hinman memo. The Mazurs argue Merck knew of the study, although it appears it was not necessarily aware of the results, see Freilich dep. at 150, and should have known informed consent was "exceedingly difficult" to obtain. Therefore, they contend Merck should not have relied on the CDC

to convey an adequate warning. Even if I were to assume Merck knew the results of the 1977 study, it does not follow Merck knew or should have known the October, 1980, measles, mumps, and rubella vaccine Important Information Statement would not be understood.

At the time of the 1977 study, the measles, mumps, and rubella vaccine Important Information Statements were separate forms. Hinman memo. In his memorandum, Dr. Hinman clearly states later versions of the statements would be revised and would appear on one form. *Id.* Thus, the 1980 Important Information Statement was a different and, apparently, improved warning. Dr. Hinman stated in his deposition that "we do not have a specific indicator based on subsequent [to 1977] similar field trials of the degree of comprehension of the forms." Hinman dep. at 101, attached as Mazurs' exhibit 46. Dr. Hinman admits, then, there has been no comprehension study of the 1980 MMR II form. The Mazurs have not shown otherwise.

Moreover, Dr. Hinman also admitted the "results of the ... [1977] study were not very understandable ... and the report of the pilot study itself is incomprehensible." *Id.* This calls into question whether the 1977 study is even a valid report in the eyes of the agency that conducted it. I am not persuaded Merck should be bound by a study the CDC considers "incomprehensible."

### 5. Merck's investigation of the CDC was sufficient.

Finally, the Mazurs complain Merck did not properly investigate the CDC's capabili-

---

**15.** "Unnecessary risk" is the risk above and beyond that which is inherent in the vaccine, *i.e.,* a risk that results from the distribution of the vaccine to someone who should not receive it rather than from the distribution of the vaccine to someone who should receive it. As I noted in my first opinion, the MMR II vaccine falls within the category of "unavoidably unsafe products," *Incollingo v. Ewing,* 444 Pa. 263, 287, 282 A.2d 206, 219 (1971) (quoting, Restatement (Second) of Torts, § 402A, comment k). *Mazur,* 742 F.Supp. at 251.

**16.** Dr. Hinman reported these general impressions:

  a. 19.7–29% did not read the entire form;
  b. 8.2–13.8% did *not* feel they understood what they read; 0.7–3.0% did *not* feel they understood what they were told;
  c. Only 2 people refused immunization after reading the forms (1 polio, 1 DTP); and
  d. For each question asked about the disease, the vaccine, number of doses, precautions, etc., a fairly steady 12–25% responded "don't know."

Hinman memo. (emphasis in original).

ty to disseminate an adequate warning and failed to monitor the CDC's performance under the contract. The Mazurs assert this lack of diligence rendered Merck's decision to rely on the CDC unreasonable. There are two problems with this contention. First, the Mazurs have not introduced a single bit of proof, other than Mrs. Mazur's own self-serving declaration, that the CDC was not disseminating Important Information Statements. The Mazurs have had ample opportunity to create some doubt as to the CDC's performance under the contract. They have not done so.

Second, Merck did investigate, before and after the contract was signed, the CDC's performance and found it to be more than satisfactory. Merck initially selected the CDC as the vehicle through which it would provide adequate warnings to consumers because the CDC sold the vaccine to the state and local health organizations, supervised the distribution of vaccines, and had vastly more experience than Merck did in the public health field. Merck based its decision on its own past experience with the CDC; recommendations from physicians, the Bureau of Biologics, consumer groups; and on conversations with the CDC. Freilich dep. at 144. After it made its decision, it monitored the CDC's performance through conversations with these same individuals and others. Freilich states he and other employees at Merck spoke with the CDC, private physicians affiliated with the American Academy of Pediatrics, the Bureau of Biologics, parent and consumer groups, and members of the Redbook Committee. *Id.* at 145–46, 195, and 306. Each one of these sources told him and the other employees that consent forms and Important Information Statements were being sent out by the CDC and, in turn, to parents by local health organizations participating in CDC immunization programs. *Id.* at 145–47, 154, 195–96, 306–09. In fact, one parent group representative complained that the use of the consent forms was "barring their recovery in lawsuits." *Id.* at 154. Through its regular contact with these sources Merck continually checked the CDC's dissemination efforts. At no time did it appear the CDC

was not doing its job. Merck might have been more thorough in its examination; for example, it could have hired an independent contractor to review the CDC's conduct, but the results would have been the same. The CDC was disseminating an adequate warning to vaccine recipients. In the end, Merck, whether the source of its information was its own employees or an independent contractor, could not have foreseen that Mrs. Mazur would not receive an Important Information Statement which contained an adequate warning of the risks of MMR II immunization. Accordingly, Merck exercised reasonable care to be sure the Mazurs were informed directly of the risks of MMR II vaccinations.

*B. Nurse Frederick was a Learned Intermediary.*

■ Merck's contract with the CDC provided the CDC was to take appropriate steps to ensure the presence of a physician at each inoculation or give warning to the potential vaccine recipient of the risks involved. The CDC did not impose the physician requirement in the Philadelphia inoculation program. Nevertheless, the health department had a school nurse present at inoculation.

In my first opinion, I predicted the Pennsylvania courts would hold that, in appropriate circumstances, a nurse can act as a learned intermediary. *See Mazur*, 742 F.Supp. at 253–55. I need not revisit that issue here and will only review the record to determine if in fact Nurse Frederick was a learned intermediary on February 26, 1982. That determination will depend on her qualifications as a medical professional, her knowledge of and experience with vaccine administration to school children, and whether she made considered medical judgments with regard to the children entrusted to her care.

Edith Frederick has been a registered nurse in Pennsylvania since 1949. Shortly after receiving her nursing certificate she gained practical experience in several hospitals and psychiatric clinics in this region. She had some exposure to pediatrics, but no special training or experience with vac-

cine administration. As a registered nurse, she cannot prescribe drugs but can administer or dispense previously prescribed drugs. Frederick dep. II at 53.

Nurse Frederick received her bachelor of science degree in education from Temple University in 1971 or 1972 and her master's equivalency degree in education from the same school in 1976. She has not written a master's thesis. She received additional training in a nurse practitioner program at the Hospital of the University of Pennsylvania ("HUP") during the 1980–81 school year. *Id.* at 9. Classes met once a week on Saturdays and lasted the entire day. Nurse Frederick volunteered for the program, which was funded by the school board. *Id.* at 10. The HUP program was intended to provide a review of the basic health courses such as anatomy and physiology. It had a special focus on physical examinations of children. *Id.* at 58–59. The program did not include vaccine training or education. *Id.* at 59.

Nurse Frederick began her employment with the school board as a school nurse in 1964. Her first assignment was at Olney High School where she trained under two more experienced nurses. She received no immunization experience at that school. She was transferred to two other schools for the next year, but once again was not involved in an immunization program.

In 1968, Nurse Frederick was placed at the Morrison School, which Lisa Mazur would later attend. Nurse Frederick worked there three days each week and at another school two days. The Morrison School had approximately six hundred students. Nurse Frederick described herself as the "contact person" Morrison school parents would call if they had questions about their child's health or a vaccine program. *Id.* at 23.

At the time Lisa received her vaccination in February, 1982, Nurse Frederick had seen other students with measles and had seen and could thoroughly describe the symptoms of the disease. *Id.* at 23–24. She knew the complications that could arise from measles, such as hearing problems, meningitis, and encephalitis. *Id.* at 24.

She also knew that side effects of a measles vaccine were possible hearing loss, meningitis, encephalitis, and death. *Id.* at 25 and 88–89. She did not know SSPE was a possible complication of a measles infection or the measles vaccine. *Id.* at 88. She was not aware if the mumps vaccine produced any side effects, although she knew the mumps virus can cause testicular problems. *Id.* at 88–89. As for rubella, she was aware both the virus and the vaccine may be harmful to pregnant students and their babies. *Id.* at 89–90. While Nurse Frederick knew and understood the complications and side effects of both the diseases and the vaccines to prevent the diseases, she could not state how a virus travels through the body, how a virus causes illness, or how a vaccine prevents illness. *Id.* at 88–90.

She got her information on the three diseases and the related vaccines from her general experience in the school health field, materials issued by the school board, medical journals to which she subscribes and reads, unknown articles, periodic health bulletins distributed by the school board and the health department, and the Important Information Statements provided to her for distribution to students. *Id.* at 27–28 and 90–93. In the years prior to the 1981–82 immunization drive, Nurse Frederick also participated in two or three other, smaller immunization programs at the Morrison School. Those programs were optional, whereas the 1981–82 drive was mandatory for all students. The administration of the vaccines operated essentially in the same way as the larger drive in 1982. *See infra* at 710.

In 1981, all school nurses were required to attend a district meeting to discuss the immunization program and to receive instructions as to how each nurse should administer it. Frederick dep. II at 31. The district administrators and nurse supervisors instructed the nurses on how to select children based on their school health records, to inform children of the program, to amass packets of information for parents, to send that information to parents, to screen children at vaccination, and to up-

date records after vaccination. The nurses received a copy of the Important Information Statement, which was used to discuss the risks and benefits of vaccination during the meeting, *id.* at 95 and 97; a permission letter from Dr. Herbert Hazan, a school board health director, for parents to read and return to the school, *id.* at 95; and a list of instructions as to how to go about setting up the immunization program in each school. *Id.* The supervisors reviewed and explained each of the documents for the nurses. *Id.* at 31 and 97.

When Nurse Frederick returned to the Morrison School she began the record review to determine which, if any, vaccine each student needed. She spent four hours a day for approximately two weeks poring over the medical records. *Id.* She called certain parents whose children had a special health problem to inform them of the immunization program. *Id.* at 33–35. Nurse Frederick prepared the documents to be sent to parents and reviewed them before she passed them out. *Id.* at 102 and 105. She re-read the Important Information Statement at that time. *Id.* at 102. She provided each homeroom teacher with a packet of information for each student with that student's name on it. The packet included the letter and permission slip from Dr. Hazan and the Important Information Statement corresponding to the vaccine the student was scheduled to receive.

Before she handed out the packets to the students, she spent a few minutes with each class generally describing the program and the information they would receive and what they should do with it. *Id.* at 105–07. She warned middle and high school students if they were pregnant they should not receive any vaccines. *Id.* at 108.

When the permission slips were returned, Nurse Frederick checked them against her master list. In particular, she looked for additional health information from parents, such as special warnings or prior undocumented vaccinations. *Id.* at 115. She excluded children from her list based upon the information she received from their parents. *Id.* She sent home to parents a flier indicating the date and time

of the vaccination and arranged for certain parents to volunteer on that day. *Id.* at 129–30.

On February 26, 1982, the date of inoculation, she returned the consent forms to the students so they could hand them back to her when they reached the head of the line. She and the technician who administered the vaccines placed themselves in the center of the Morrison School gymnasium. She brought the school medical records, a list of children with special medical problems, and some basic medical equipment: band aids, cotton balls, and thermometers. *Id.* at 132. As the students reached her, she took their consent form, checked it against her medical records and special listing, determined which vaccine was appropriate, and told the technician which one to give the students. *Id.* at 133. She also cursorily examined the children as they went past her. She assessed how each child appeared and behaved. *Id.* at 141. Specifically, she was looking for signs of lethargy, runny eyes and noses, coughing, or sneezing. *Id.* Sometimes she asked students how they were feeling. *Id.* She touched or placed an arm around some of the sick or nervous children. *Id.* Children on her special listing of health problems received a more thorough examination. *Id.* at 147. Nurse Frederick stated she would have excluded students who did not appear healthy to her or told her that they were not feeling well. *Id.* at 38. Decisions to exclude students were within her discretion and were final. *Id.*

Nurse Frederick did not ask any of the students about corticosteroid use, recent illnesses or operations, or about other medications being taken at that time. *Id.* at 146–48.

Nurse Frederick does not remember seeing the package circular before or during the inoculation. *Id.* at 98. It was not provided to her as part of the district meeting materials. *Id.* She was aware, however, the package circular came with each vial of the vaccine. *Id.*

At the conclusion of the program, Nurse Frederick went back into her school

records to update them with the recent immunizations. *Id.* at 162.

Nurse Frederick vaguely remembers Lisa Mazur and can generally describe her. *Id.* at 175–76. She cannot remember Lisa's receiving a vaccine or anything about Lisa's condition.[17] *Id.* at 176.

Looking at the totality of her qualifications and what she did, it is clear that Nurse Frederick was acting as learned intermediary at the time of Lisa's inoculation. Nurse Frederick had the required general education, experience, and authority. She had specialized knowledge concerning the proposed treatment to be administered. She had read the Important Information Statement on at least two occasions before the vaccines were administered. She had particularized understanding of measles, mumps, and rubella; their symptoms and complications; and the vaccines intended to prevent them.[18] She knew some of the more common side effects of those vaccines. Specifically, she was aware that encephalitis could follow from the measles virus and the measles vaccine. It is important to note that she did not prescribe MMR II, but she could and did direct when it was not to be given. She was an experienced medical professional with specific training as to the vaccine in question. In sum, her knowledge of the "palliative," *Reyes*, 498 F.2d at 1276, was sufficient. She was knowledgeable as to health issues of school-age children. Parents relied upon her expertise to aid them when they had questions concerning the school health programs and their child's needs. She reviewed the records of the children at the Morrison School and made individualized decisions concerning each of them.[19] On February 26, 1982, Nurse Frederick checked the students, including Lisa, for visible signs of illness. Ultimately, Nurse Frederick "made a considered medical judgment," *Rohrbough v. Wyeth Laboratories, Inc.*, 719 F.Supp. 470, 478 (N.D.W.Va.1989), and permitted Lisa to receive her MMR II vaccine.[20]

**17.** Nurse Frederick was not asked by counsel if she remembered if Lisa returned a consent form. Lisa's consent form is missing, but she did receive her shot. Additionally, Nurse Frederick was not asked if she would have let Lisa receive a vaccine if Lisa did not have a consent form.

**18.** There is no question that Nurse Frederick's understanding of how the vaccines work in the body was less than complete. She could not state how the virus travels in the body, how the vaccine creates antibodies to ward off infection, or how it sometimes causes harmful side effects. This lack of understanding does not in and of itself disqualify her from being a learned intermediary. There is no requirement that the learned intermediary know everything there is to know about a particular drug product anymore than a complete understanding of the internal combustion engine is required before a person can be licensed to operate a motor vehicle. As long as she possessed enough knowledge of the "propensities of the drug," *Spychala v. G.D. Searle & Co.*, 705 F.Supp. 1024, 1031 (D.N.J.1988), and of the patient to permit her to make an informed, individualized medical judgment, she was a learned intermediary. The requirement is not that she be the "*most* learned intermediary," just a "learned intermediary," which she clearly was on that day.

**19.** Merck did not have to show that Nurse Frederick actually made an individualized medical judgment concerning Lisa's inoculation. It need only have shown that Nurse Frederick was a qualified learned intermediary, that is, *capable* of making an individualized medical judgment, and was present at the time of her inoculation. *Hurley v. Lederle Laboratories*, 863 F.2d 1173, 1179 (5th Cir.1988).

**20.** In *Hurley v. Lederle Laboratories*, 863 F.2d 1173, 1179 (5th Cir.1988), the court found the fact that a nurse administered the vaccine as a routine matter and the physician did not see the patient at the time of the vaccination because he was not in his office did not "bar the application of the learned intermediary doctrine to relieve the manufacturer of liability." The *Hurley* court based its decision on a finding that a physician-patient relationship existed and the doctor had assumed the role of learned intermediary. *Id.* The court reasoned that since the doctor assumed the burden of presiding over the patient's best interest, he, not the vaccine manufacturer, also assumed the corresponding duty to warn the patient. In other words, the vaccine manufacturer is not responsible for how the learned intermediary conducts his business. A recent decision in the Pennsylvania courts turned on that point. In *Taurino v. Ellen*, 397 Pa.Super. 50, 579 A.2d 925, 928 (1990), the court opined where a prescription drug manufacturer which had no reason to know that the learned intermediary would not administer the drug product but had provided an adequate warning to him, the manufacturer was not liable when the drug was dispensed to the plaintiff without an individualized medical judgment by the learned intermediary. The court stated that:

*C. Merck's Warning to Learned Intermediaries.*

*1. Merck provided a warning: the package circular.*

There is some dispute between the parties over whether a package circular, adequate or inadequate, was made available to Nurse Frederick. She cannot remember if she saw a package circular. Frederick dep. II at 98. She knows from prior experience, however, that in general a package circular is "the little folder that comes in with the bottle of vaccine." *Id.* The deposition testimony of Daniel S. Wood, Jr., the health department technician who administered the vaccines to the Morrison School children, is also somewhat unclear. Deposition Testimony of Daniel S. Wood ("Wood dep."), at 51, attached as Merck's exhibit Q. It seems that Wood brought a few package circulars with him to the Morrison School, Wood dep. at 51, but he might not have made one available to Nurse Frederick. The parties differ as to whether Wood's actions suffice to make the circular available to her.

Both sides make more of this issue than is necessary. The resolution is quite simple. Merck exercised reasonable care to provide Nurse Frederick with a package circular because it enclosed one in every container of the MMR II vaccine sold to the CDC and the health department. Freilich aff. at ¶ 24. Wood confirmed that a package circular was in every package of MMR II vaccine he opened. Wood dep. at 50. The Mazurs do not contest Freilich's or Wood's statements. They have not suggested, let alone shown, Merck should have known the package circular would not reach Nurse Frederick (although one may have). Nurse Frederick knew where to locate a package circular if she believed it necessary to perform her assumed tasks. If she had asked Wood for a package circu-lar, he would have provided her with one. Wood dep. at 22 and 51. Even if he had thrown them all away before he arrived at the Morrison School, Merck cannot be held responsible for his actions. It satisfied its obligation when it provided the vaccines with package circulars to the CDC and the health department, which in turn made them available to Nurse Frederick. She could have seen a package circular had she wanted to do so. The possibility that she did not see one is not controlling of the issue of whether Merck exercised reasonable care to see that a warning would reach her. Merck took all reasonable steps to make sure a warning would be available to Nurse Frederick.

It seems the Mazurs contend that unless there is affirmative proof the learned intermediary actually read the package circular, the vaccine manufacturer must be held liable. No case supports this contention; the law and common sense are just the opposite. The vaccine manufacturer is not responsible for how the learned intermediary chooses to do her job. Once an adequate warning is made available, it is solely the responsibility of the learned intermediary to read it and inform the patient of its meaning as it may apply to him or her. *Hurley,* 863 F.2d at 1178–79; *Taurino,* 579 A.2d at 928. In *Walker v. Merck & Co., Inc.,* 648 F.Supp. 931, 935–36 (M.D. Ga.1986), *aff'd without op.,* 831 F.2d 1069 (11th Cir.1987), the court found that once Merck provided an adequate warning of MMR II's risks to the plaintiff, it did not become an "insurer ..., and cannot be held liable for a consumer's failure to read or to listen to understandable warning." Similarly, here, Merck is not vicariously liable for Nurse Frederick's failings, if there were any. That Nurse Frederick may not have seen the package circular does not implicate Merck, which had previously exercised reasonable care to make an ade-

[i]n such a case, the manufacturer fulfills its duty under the learned intermediary doctrine at the time it sells the product with adequate warnings directed to a physician. No new duty is created by the fact that after the sale no physician actually becomes involved in prescribing the drug. Although liability of a variety of kinds might then attach to the per-son providing the drug without the intervention of a physician, the manufacturer has no liability.... [T]o hold otherwise would be to confuse the duties of the manufacturer and of those other persons who later become involved in the provision of the drug.

*Taurino,* 579 A.2d at 928.

quate warning available to her. To suggest Merck had to have someone present at each inoculation of MMR II to double-check that the appropriate precautions were taken is ludicrous.

### 2. The warning was adequate.[21]

■ The April, 1981, MMR II package circular, the one in use during the 1981–1982 immunization program, included this revaccination warning:

> Revaccination: Based on available evidence, there is no reason to routinely revaccinate children originally vaccinated when 12 months of age or older; however, children vaccinated when younger than 12 months of age should be revaccinated. The decision to revaccinate should be based on evaluation of each individual case.

The Mazurs argue this statement was inadequate because it misstated the true revaccination risks. They propose the following language should have been included in the package circular:

> In the event you suspect your child received measles vaccine after the age of approximately 15 months, we strongly advise against repeating measles vaccine because of the small but *real* danger of brain damage.

Geraghty aff., ¶ 36.[22] Unfortunately for the Mazurs, they did not introduce any evidence which shows Merck's warning was improper and they did not introduce any evidence which shows their proposed warning is proper. Merck, however, introduced substantial evidence that its warning was proper given the state of medical knowledge in 1982 and is certainly appropriate in light of the current medical evidence (and quite likely understates the importance of revaccination).

Dr. Geraghty proposed the change or addition to the package circular. Geraghty aff. at ¶ 36. He is fully qualified to propose a modification. *Mazur*, 742 F.Supp. at 263–64. His own affidavit, though, undercuts the weight to be given to his proposal and the medical evidence on which he relied does not support his proposal.

In his affidavit, ¶¶ 30–32, Dr. Geraghty describes a number of inadequacies in the MMR II package circular.[23] He explains why each one is inadequate and how the inadequacy lead to Lisa's illness. Geraghty aff. at ¶¶ 30–31. Despite this rather exhaustive review of the package circular, he never opines that the revaccination warning was inadequate. In fact, there is no mention of the revaccination warning until the very end of his affidavit. *Id.* at ¶ 36. Even that statement shows his real concern is not what the package circular said about revaccination but what the Important Information Statement had not said about it. He claims that the package circular and the Important Information Statement should have included the warning described above. It can be seen from the

---

**21.** The Mazurs argue in my prior opinion I foreclosed a second motion for summary judgment on the adequacy of the package circular. The Mazurs are incorrect. I found Merck did not address in the first round of briefing the revaccination claim asserted by the Mazurs, *Mazur*, 742 F.Supp. at 258, and I found the Mazurs raised a genuine issue of material fact concerning the adequacy of the MMR II revaccination warning, *id.* In my order I permitted the parties to conduct additional discovery and supplement their respective filings "on the duty to warn claims." *Id.* at 266. Clearly, the Mazurs' duty to warn claims included the charge the revaccination warning was inadequate. Merck properly moves for summary judgment on that charge at this time. In any event, the Mazurs responded to Merck's contentions, *see* Mazurs' surreply at 5–6, and had the opportunity to address more completely those contentions in its response and surreply.

**22.** Dr. Geraghty essentially contends that when the inherently dangerous MMR II vaccine is administered to previously-vaccinated individuals, especially those who seroconverted, *i.e.* developed immunity, after the first inoculation, the risk of serious illness multiplies. He suggests that a simple blood test should be given before a second dose of MMR II is prescribed to determine if the potential recipient had seroconverted initially; if so, he argues no second inoculation should be given to that person. The risk of illness, he maintains, is too high relative to the minimal cost and effort of administering a blood test.

**23.** For a discussion of the merits of the alleged inadequacies see *Mazur*, 742 F.Supp. at 258–59.

language used by Dr. Geraghty that he intended parents, not learned intermediaries, read the warning. The "your child" reference could not and would not be included in a package circular. Dr. Geraghty may well have included this proposed modification to the package circular as an afterthought since it does not comport with his analysis of the package circular in his affidavit. Because of these internal inconsistencies, his opinion is entitled to little weight.

Dr. Geraghty's opinion is entitled to even less weight because it is not supported by the facts as they existed in 1982 and, without question, is not supported, indeed it is contradicted, by the facts in 1991. The adequacy of the MMR II package circular must be evaluated by what was known in the medical field at the time Lisa received her vaccine on February 26, 1982. *Liebowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 307 A.2d 449, 458 (1973).

Dr. Geraghty lists twenty-one scholarly articles he read to educate himself on the relationship between SSPE, measles, and the measles vaccine. Geraghty aff. at ¶ 24. Only fifteen of them pre-date Lisa's vaccination. Not one of the fifteen articles shows an enhanced risk of brain damage following revaccination. In fact, only one of the articles even discusses the risks associated with measles revaccination and concludes that there is no proof of an enhanced risk of SSPE.[24] Dr. Geraghty must have been aware of the lack of support to be found in the twenty-one articles because

his own summaries of them do not include any information about revaccination risks. *Id.* At best, the articles show a possible relationship, not necessarily causative, between the measles virus, wild or attenuated, and SSPE. From this, I gather, Dr. Geraghty's extrapolates his revaccination postulate. It, however, does not raise a genuine issue of material fact as to the adequacy of the package circular.

In addition to the Halsey study, *see* below at 44 n. 24, the ACIP stated "[t]here is no evidence of enhanced risk from receiving live measles vaccine in persons who have previously received live measles vaccine or had measles. *Specifically, there does not appear to be any enhanced risk of SSPE.*" Recommendations of the Immunization Practices Advisory Committee, 31 *Morbidity and Mortaility Weekly Report* 217, 221 (1982). At the time of Lisa's vaccination, Merck's revaccination warning was adequate in light of the then known revaccination risks, which appear to be no risk at all.

Looked at through the current state of medical evidence, Merck's MMR II revaccination warning would be inadequate in that it does not, ironically, *recommend* revaccination. The ACIP and the Redbook Committee now recommend that all children receive two doses of measles vaccine.[25] Recommendations of the Immunization Practices Advisory Committee, 38 *Morbidity and Mortality Weekly Report* S–9 (1989); Recommendations of Committee on

24. Halsey, *et al.*, *Risk Factors in Subacute Sclerosing Panencephalitis: A Case–Controlled Study*, 111 American Journal of Epidemiology 415 (1980). In the Halsey study, fifty-two children with SSPE were compared with ninety-eight healthy children controls. One of the aims of the study was to test "whether measles vaccine given to children who are immune to measles (from a measles infection or earlier vaccination) might contribute to the risk of developing SSPE." *Id.* at 422. The conclusion reached was: *"no evidence to support such a hypothesis was found in our study."* *Id.* (emphasis added).

25. The Redbook Committee recommendation provides:

I. Routine Vaccination

The Committee recommends two doses of measles vaccine for all children after the first birthday. In routine circumstances, the first dose should be given as measles, mumps, rubella (MMR) at age 15 months and the second also as MMR at entrance to middle school or junior high school.

Revaccination at this age appears desirable in order 1) to achieve rapid impact, since the risk of measles increases substantially soon after entrance to middle school or junior high school, 2) to boost immunity shortly before the high risk period, and 3) to reinforce possible waning immunity.

The ACIP recommendation provides "[t]here is no evidence of increased risk from live measles vaccination in persons who are already immune to measles, as a result of either previous vaccination or natural disease." *Morbidity* at 12.

Infectious Diseases of the American Academy of Pediatrics, "Measles: Reassessment of the Current Immunization Policy," at 6, excerpt attached as exhibit A of the affidavit of Christopher M. Martin, M.D. Dr. Geraghty's opinion, standing alone in the field as it does without any supporting documentation, is not sufficient to create an issue of fact to defeat a motion for summary judgment which is amply buttressed by contrary medical evidence.

It follows that Merck's motion for summary judgment must be granted because Merck's MMR II package circular is adequate as a matter of law and it was made available to Nurse Frederick, who was a learned intermediary. Therefore, Merck did not breach its duty to warn.

IV. Conclusion

In summary, Merck must be awarded summary judgment in its favor on all of the Mazurs' claims because it exercised reasonable care to see that the Mazurs were informed of the risks of MMR II vaccination, either by direct notice or notice through a learned intermediary. Merck rightfully relied upon the CDC to provide vaccine recipients with the Important Information Statement. Nurse Frederick was a learned intermediary so far as the school inoculation program was concerned. The notice furnished to her was adequate. Therefore, Merck cannot be held responsible for Lisa's illness.