**Anthony MAZUR and Edna Mazur as Parents and Guardians of Lisa Marie Mazur, a Minor, and Anthony Mazur and Edna Mazur, in their own right, Appellants,**

v.

**MERCK & CO., INC.**

No. 91–1613.

United States Court of Appeals, Third Circuit.

Argued Jan. 23, 1992.

Decided May 20, 1992.

Rehearing and Rehearing In Banc Denied June 18, 1992.

David R. Dearden (argued), Thomas A. Sprague, Richard A. Sprague, Paul Crowley, Sprague, Creamer & Sprague, Philadelphia, Pa., for appellants.

Kenneth C. Frazier (argued), Joanne Lahner, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee.

Before: STAPLETON, SCIRICA and ALITO, Circuit Judges.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this products liability action appellants Lisa Mazur and her parents seek compensatory and punitive damages from appellee Merck & Co., Inc. for failure to warn that the use of its vaccine could result in serious neurological illness. The district court entered summary judgment for Merck on the ground that it provided an adequate warning to a learned intermediary, and, in the alternative, exercised reasonable care to inform users of the risks of its vaccine by contractually obligating the United States Centers for Disease Control (CDC)[1] to warn vaccinees directly. *Mazur v. Merck & Co.*, 767 F.Supp. 697 (E.D.Pa.1991). Because we conclude that Merck satisfied its duty to warn by contractually obligating the CDC to warn vaccinees directly, we will affirm.

I.

In response to a measles epidemic in the late 1970s, the Philadelphia Department of Public Health proposed a regulation, later adopted by the School Board of Health, requiring all school children to be vaccinated against a variety of pediatric diseases. Under the regulation, school nurses were instructed to review the health records of about 300,000 students city-wide to determine which vaccines, if any, they needed, and to obtain written permission from students' parents for vaccination in appropriate cases. Where adequate proof of prior vaccinations or diseases was not forthcoming, students were considered unimmunized.

Based on a recommendation and information from the CDC, Dr. Robert G. Sharrar, a director of the Philadelphia health department, selected M–M–R II (MMR II) as the measles vaccine for the city's immunization program. MMR II is a live-virus vaccine for simultaneous immunization against measles, mumps, and rubella. It is a prescription drug and has been manufactured by Merck since 1978 under a license from the United States Food and Drug Administration.

The MMR II vaccine is distributed in vials containing an FDA-approved "package circular," describing the risks attendant to the vaccine's use. In April 1981 the package circular contained the following statement about the risk of contracting subacute sclerosing panencephalitis (SSPE), a fatal, slowly progressing neurological disease, from inoculation with the MMR II vaccine:

There have been reports of [SSPE] in children who did not have a history of natural measles but did receive measles vaccine. Some of these cases may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccine distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5–10 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study concluded by the [CDC] suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent risk of SSPE.

The package circular also contained the following paragraph on revaccination:

Based on available evidence, there is no reason to routinely revaccinate children originally vaccinated when 12 months of age or older; however, children vaccinated when younger than 12 months of age should be revaccinated. The decision to revaccinate should be based on evaluation of each individual case.

The Philadelphia health department purchased the MMR II vaccine for the city's immunization program from the CDC,

---

1. The CDC is an arm of the Public Health Service of the United States Department of Health and Human Services. It is charged with protecting the public health of the nation by providing leadership and direction in the prevention and control of diseases and responding to emer-

gencies. The CDC also provides assistance to state and local health agencies in the form of project grants to assist them in activities aimed at eliminating certain diseases, including measles. *See* 42 U.S.C. § 247b (1988).

which had purchased it from Merck. Merck was at first reluctant to sell its MMR II vaccine to the CDC, but relented after the CDC agreed to the following contractual provision:

> The [CDC] represents and agrees that it will (1) take all appropriate steps to assure that all vaccine supplied to various locations within the 50 states, ... pursuant to the terms of this contract, shall be administered to each patient on the basis of an individualized medical judgment by a physician, or (2) take all appropriate steps to provide to such a patient (or to the patient's parent or guardian) meaningful warnings relating to the risks and benefits of vaccination, in form and language understandable to such patient, parent or guardian.[2]

Opting to proceed under the latter clause, the CDC drafted an "Important Information Statement," designed to inform parents of the risks of inoculation with the MMR II vaccine in lay terms. It then obligated state and local health agencies who purchased MMR II vaccine from it, including the Philadelphia health department, to distribute the Important Information Statement to vaccinees, parents, or their guardians. The Important Information Statement was distributed to nurses at a district-wide informational meeting on the city's immunization program, and was forwarded to parents by way of their children.

Lisa Mazur's mother claims that she never received the Important Information Statement, or any other document pertaining to the risks associated with use of the MMR II vaccine. But she admits to having been notified of the immunization program, and, in particular, receiving a letter from the school district explaining the program with an attached immunization record and written permission form. Mrs. Mazur neither signed nor returned the permission form.

Instead, she called Lisa's school principal and an official at the Board of Education, and told them that Lisa was immunized for measles in 1973 and that she would not consent to her revaccination. Then, to prevent Lisa from being revaccinated, Mrs. Mazur kept her out of school for a week. But she eventually relented under pressure from school officials, and sent Lisa back to school. Shortly thereafter, students were immunized at Lisa's school, the Andrew J. Morrison School.

The immunization program was administered at the Morrison School by Edith B. Frederick, a registered nurse. Nurse Frederick was responsible for personally reviewing student health records to determine which students had been previously vaccinated and to check for medical conditions that might heighten the risks of vaccination. She also arranged the immunization forms that were sent home with students, including the Important Information Statement, distributed them to students, and collected the permission forms that were returned.

Students were inoculated at the Morrison School on February 26, 1982. They were led into the school gymnasium single file, one classroom at a time. Nurse Frederick and a technician who administered the vaccination shots were situated at a table. As students approached them, Nurse Frederick took each student's permission form, checked it against her health records, and informed the technician which vaccine to administer. Nurse Frederick also examined the "overall appearance" of students as they passed by her, and, sometimes, asked them how they felt. On average it took students three to four minutes to pass through the line and be vaccinated. No physician was present during the inoculation, nor was any representative from either Merck or the CDC.

Although Nurse Frederick's records do not include a signed permission form for Lisa Mazur, they indicate that she was inoculated with the MMR II vaccine that day. On September 7, 1983, shortly after her fourteenth birthday, Lisa was admitted to St. Christopher's Hospital for Children in Philadelphia because of "personality

---

2. The identical provision was contained in all three purchase agreements entered into between Merck and the CDC for use of the MMR II vaccine in the public health sector.

changes" and "abnormal movements." On November 2, 1983, she was diagnosed with SSPE.

On October 18, 1985, the Mazurs filed this action in the Philadelphia Court of Common Pleas seeking compensatory and punitive damages. Their complaint alleges negligence and strict liability claims against Merck under Pennsylvania law for, among other things, failure to provide an adequate warning. Merck removed the action to federal district court, and moved for summary judgment on the Mazurs' failure to warn claims.

Merck contended that (1) the Mazurs' state law claims were preempted by the pervasive scheme of federal regulations governing the production, labeling, and distribution of vaccines; (2) the Mazurs' action was barred by Pennsylvania's two-year statute of limitations for tort claims; and (3) Merck met its duty to warn by informing Dr. Sharrar of the risks associated with the MMR II vaccine, and, alternatively, obligating the CDC to ensure that the vaccine was administered by a physician or to provide meaningful warnings to vaccinees.

The district court issued an opinion and order denying Merck's motion for summary judgment on the federal preemption and statute of limitations issues. *Mazur v. Merck & Co. (Mazur I)*, 742 F.Supp. 239 (E.D.Pa.1990). But it reserved judgment on the issue whether Merck met its duty to warn, and instead allowed further discovery and additional filings on this matter. Merck then filed a supplemental motion for summary judgment, which the district court granted. *Mazur v. Merck & Co. (Mazur II)*, 767 F.Supp. 697.

Drawing on its earlier opinion, the district court held that (1) Merck had a "duty to exercise reasonable care to inform those for whose use [its MMR II vaccine] was supplied of the facts which make it dangerous"; (2) Nurse Frederick acted as a learned intermediary, because she "made a

considered medical judgment" as to which students should be vaccinated on February 26, 1982; (3) the package circular constituted an adequate warning; and (4) Merck reasonably relied on the CDC to see that users were informed of the risks of its MMR II vaccine directly. *Id.* Accordingly, the district court granted summary judgment for Merck.[3] This appeal followed.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We are required to address two novel issues of Pennsylvania products liability law: first, whether the learned intermediary rule extends to a registered nurse who supervises the vaccination of students as part of a city-wide immunization program; and second, whether a vaccine manufacturer may satisfy its duty to warn in the mass immunization context by contractually obligating the CDC to inform users of the risks of its vaccine directly.

Our review of the district court's thorough and careful opinions and order granting summary judgment is plenary. *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir.1988). We apply the same principles governing the district court's determination whether to grant summary judgment:

> [W]e must be convinced that the prevailing party has successfully demonstrated "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Moreover, all inferences must be drawn against the movant ... and in favor of the nonmovant.

*Id.* (citations omitted). Merck bears the "ultimate burden of showing the absence of a genuine issue as to any material fact." *Gans v. Mundy*, 762 F.2d 338, 343 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). But if this standard is met, the burden shifts to the Mazurs to

---

**3.** Because the district court granted Merck's supplemental motion for summary judgment, it did not address the issue of proximate causation. *Mazur II*, 767 F.Supp. at 698 n. 1. At oral argument, Merck asserted that, even assuming Merck breached its duty to warn, the Mazurs

have failed to establish that this breach was a proximate cause of Lisa Mazur's condition. Because we conclude that Merck satisfied its duty to warn as a matter of law, we do not reach the issue of proximate causation.

establish a "genuine issue of material fact." *Id.*

We apply Pennsylvania law and must predict how the Pennsylvania Supreme Court would decide this case. "The decisions of the Pennsylvania Superior Court, 'while not controlling, are "indicia of how the [Pennsylvania Supreme Court] might decide" the issue.'" *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir.1991) (quoting *McNasby v. Crown Cork & Seal Co.*, 888 F.2d 270, 281 (3d Cir.1989)).

### A.

▮ Our first task is to determine whether the district court properly formulated Merck's duty to warn. As the district court noted, "ordinarily" Pennsylvania courts impose strict liability on manufacturers of products sold "in a defective condition unreasonably dangerous to the user or consumer" under section 402A of the *Restatement (Second) of Torts*.[4] *Mazur I*, 742 F.Supp. at 251 (citing *Incollingo v. Ewing*, 444 Pa. 263, 299, 282 A.2d 206, 219

---

4. § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
*Restatement (Second) of Torts* § 402A (1965). Section 402A was adopted as the law of Pennsylvania in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966).

5. *k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected.... Such a product, properly prepared,

---

(1971)). Products sold without adequate warnings of the risks attendant to their use are considered defective. *Id.; see Restatement (Second) of Torts* § 402A cmt. h.

However, as the district court observed, "the strict liability rules for prescription drugs, such as vaccines, are somewhat different under Pennsylvania law." *Id.* These products fall into the category of "unavoidably unsafe products" set forth in comment K to section 402A of the *Restatement*.[5] *Id.* (citing *Incollingo*, 282 A.2d at 219). "Such a product, properly prepared, and accompanied by directions and a warning, is not defective, nor is it unreasonably dangerous." *Restatement (Second) of Torts* § 402A cmt. k.

With respect to "unavoidably unsafe products," the district court said, the "strict liability principles of section 402A do not apply." *Mazur I*, 742 F.Supp. at 252. Instead, the district court held that section 388 of the *Restatement (Second) of Torts*[6] applies, regardless whether the

and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot be legally sold except to physicians, or under the prescription of the physician.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known and apparently reasonable risk.
*Restatement (Second) of Torts* § 402A cmt. k.

6. § 388. Chattel Known to be Dangerous for Intended Use.
One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

plaintiff's failure to warn claim is founded in negligence or strict liability. Under that section, "the supplier has a *duty to exercise reasonable care* to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." *Id.* at 252 (quoting *Incollingo,* 282 A.2d at 220 n. 8) (emphasis in original).

Thus, the district court concluded:

Since the Mazurs assert that Merck is both strictly liable and liable for negligence in failing to warn them of the dangers of the MMR II inoculation, a liability analysis under either theory will depend on whether Merck complied with the "duty to exercise reasonable care to inform" the Mazurs of health risks associated with MMR II use.

*Id.* We agree.

■ Although the Mazurs apparently do not dispute that the MMR II vaccine is an "unavoidably unsafe product," they argue that the district court erred by failing to distinguish between a prescription drug manufacturer's duty to warn in strict liability as opposed to negligence. According to the Mazurs, "[w]hen a particular product is not accompanied by an adequate warning, the product is defective and the manufacturer is strictly liable under section 402A, regardless of the care which the manufacturer took to ensure that proper warnings would accompany that product."

Although adequacy of warning is relevant to the determination whether a prescription drug manufacturer has met its duty to warn, the Pennsylvania Supreme Court has consistently formulated the prescription drug manufacturer's duty to warn under the section 388 "reasonableness" standard. The seminal case is *Incollingo v. Ewing.* There the parents of a child who died after being administered Chloromycetin, a broad spectrum antibiotic,

brought a negligent failure to warn claim against the prescription drug manufacturer. The Pennsylvania Supreme Court began its analysis of the plaintiffs' failure to warn claim by looking to section 402A of the *Restatement.* However, because it found Chloromycetin to be an "unavoidably unsafe product," the court held that section 388 of the *Restatement* supplied the defendant's duty to warn. 282 A.2d at 220 & n. 8.[7]

The Mazurs contend that *Incollingo* is inapposite because the plaintiffs' failure to warn claim in that case was founded in negligence, and the supreme court's conclusion that section 388 governed was based on the absence of a strict liability claim. However, the *Incollingo* court's conclusion that section 402A of the *Restatement* did not apply was based on its determination that Chloromycetin is within the category of "unavoidably unsafe products," not the absence of a strict liability failure to warn claim. Therefore, because the MMR II vaccine is an "unavoidably unsafe product," we believe *Incollingo* is controlling here.

*Baldino v. Castagna,* 505 Pa. 239, 478 A.2d 807 (1984), is instructive. Although the underlying action in that case was founded in negligence, the Pennsylvania Supreme Court made clear that section 388 governs failure to warn claims founded in strict liability:

In *Incollingo* we held that, assuming proper preparation and warning, a manufacturer of drugs is *not strictly liable* for unfortunate consequences attending the use of otherwise useful and desirable products which are attended with a known but apparently reasonable risk. *Id.* 282 A.2d at 221. Rather, *such a manufacturer is liable only if he fails to exercise reasonable care to inform*

(c) *fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.* Restatement (Second) of Torts § 388 (emphasis added).

7. The *Incollingo* court explained:

Since the strict liability rule of § 402A is not applicable, the standard of care required is that set forth in § 388 of the Restatement

dealing with the liability of a supplier of a chattel known to be dangerous for its intended use. Under this section, the supplier has a duty to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous.

282 A.2d at 220 n. 8.

*those for whose use the article is supplied of the facts which make it likely to be dangerous. Id.* at 220 n. 8 (citing section 388 of the *Restatement (Second) of Torts* ).

*Id.* 478 A.2d at 810 (emphasis added). *See also White v. Weiner,* 386 Pa.Super. 111, 562 A.2d 378, 384 (1989) (applying section 388 to strict liability failure to warn claim), *aff'd without op.,* 525 Pa. 572, 583 A.2d 789 (1991); *McDaniel v. Merck, Sharp & Dohme,* 367 Pa.Super. 600, 533 A.2d 436, 445–46 (1987) (same). *But cf. Hartford Mut. Ins. Co. v. Moorhead,* 396 Pa.Super. 234, 578 A.2d 492 (1990).[8]

Accordingly, we agree with the district court that Merck's duty to warn users of the risks of its MMR II vaccine is governed by section 388 of the *Restatement.* The more difficult question is whether the district court properly determined that, as a matter of law, Merck met its duty to exercise reasonable care to inform vaccinees of the risks of its MMR II vaccine on the facts here.

■ As the district court noted, it is established under Pennsylvania law that a prescription drug manufacturer may meet its duty to warn by providing an adequate warning to a "learned intermediary," as opposed to the general public or individual users. *Mazur I,* 742 F.Supp. at 252 (citing *Incollingo,* 282 A.2d at 220). A learned intermediary is one who exercises "individual medical judgment bottomed on a knowledge of both patient and palliative," but, according to the district court, need not be a physician. *Id.* (quoting *Reyes v. Wyeth Lab.,* 498 F.2d 1264, 1276 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974)).

Where vaccine is not dispensed by a learned intermediary, but to "all comers at mass clinics," courts in other jurisdictions have said that "it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself, or by obligating the purchaser to give warning." *Id.* at 253 (quoting *Davis v. Wyeth Lab., Inc.,* 399 F.2d 121, 131 (9th Cir.1968)). This has become known as the "mass immunization exception" to the learned intermediary rule. But, as the district court observed, is better viewed as one context where the prescription drug manufacturer is obligated to warn users directly. *Mazur II,* 767 F.Supp. at 700.

The district court held that Merck met its section 388 duty to warn by providing an adequate warning (the package circular) to a learned intermediary (Nurse Frederick), and, in the alternative, by contractually obligating the CDC to see that its MMR II vaccine was administered by a physician or to provide meaningful warnings to vaccinees. We must determine whether either or both of these rulings are correct as a matter of law.

### B.

■ In *Mazur I* the district court predicted that "the Pennsylvania courts ... would hold that in appropriate circumstances a nurse can act as a learned intermediary," but left for trial the determination whether Nurse Frederick acted as a

---

**8.** In *Hartford Mutual Insurance Co.* the Pennsylvania Superior Court distinguished between failure to warn claims founded in negligence and strict liability on the ground that a negligent failure to warn claim charges improper *conduct* whereas a strict liability failure to warn claim charges a defective *product.* 578 A.2d at 501. Significantly, the product at issue in that case—sulphur strips used for making wine—is not within the category of "unavoidably unsafe products" set forth by comment k to section 402A of the *Restatement (Second) of Torts.* Therefore, the court had no occasion to invoke the section 388 "reasonableness" standard applied in *Incollingo v. Ewing.*

Courts in other jurisdictions have distinguished between negligent and strict liability failure to warn claims on a conduct/product basis, *see, e.g., Petty v. United States,* 740 F.2d 1428, 1440–41 (8th Cir.1984) (applying Iowa law), though commentators have criticized this distinction as being based more on semantics than sound policy, *see* Henderson & Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn,* 65 N.Y.U.L.Rev. 265, 275–278 (1990); Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles,* 45 Mo.L.Rev. 579, 586–87 (1980). In any event, at least in cases involving "unavoidably unsafe products," the Pennsylvania Supreme Court has not distinguished between a prescription drug manufacturer's duty to warn in negligence versus strict liability.

learned intermediary under the facts here. 742 F.Supp. at 255. In *Mazur II*, however, the district court found that "[l]ooking at the totality of her qualifications and what she did, it is clear that Nurse Frederick was acting as learned intermediary at the time of Lisa's inoculation." 767 F.Supp. at 711. The Mazurs challenge this conclusion both as a matter of law and fact.

The learned intermediary rule was first adopted by the Pennsylvania Supreme Court in *Incollingo v. Ewing*, 282 A.2d at 206. Under this rule,

> it is the duty of the prescribing physician to be fully aware of (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug. The warnings which must accompany such drugs are directed to the physician rather than to the patient-consumer as "[i]t is for the prescribing physician to use his independent judgment, taking into account the data supplied to him from the manufacturer, other medical literature, and any other sources available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug."

*Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383 (1991) (quoting *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.*, 361 Pa.Super. 589, 523 A.2d 374, 378 (1987) (internal quotation omitted)). *See also White v. Weiner*, 386 Pa.Super. 111, 562 A.2d 378.[9]

As the district court observed, courts in other jurisdictions have held that nurses may act as learned intermediaries under certain circumstances. *See, e.g., Rohrbough v. Wyeth Lab., Inc.*, 719 F.Supp. 470 (N.D.W.Va.1989), *aff'd*, 916 F.2d 970 (4th Cir.1990); *Walker v. Merck & Co.*, 648 F.Supp. 931 (M.D.Ga.1986), *aff'd without op.*, 831 F.2d 1069 (11th Cir.1987).[10] To date, however, no Pennsylvania court has recognized that anyone other than a physician may be a learned intermediary.

In two recent cases Pennsylvania courts have declined to extend the learned intermediary rule to pharmacists. In *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.* the parents of a deformed infant brought a products liability action against the manufacturer of Bendectin, a prescription drug taken during the early stages of pregnancy to prevent nausea, and the pharmacy from whom the plaintiffs purchased the drug. Among other things, the plaintiffs alleged that the pharmacy "was strictly liable in tort as Bendectin was a defective product, unreasonably dangerous due to the absence of proper warnings." 523 A.2d at 375. The trial court granted summary judgment for the pharmacy, and the Pennsylvania Superior Court affirmed on the ground that retail pharmacists have no independent duty to warn patient-consumers of the risks of prescription drugs they dispense. *Id.* at 378.

The superior court reasoned that "the warnings which are required to be given by the manufacturer must be directed to the physician," because it is for the physician to exercise his "independent medical judgment" to determine which drugs should be prescribed given the patient's medical history and condition. *Id.* Imposing an "independent duty to warn" on pharmacists would ill serve the purposes behind the learned intermediary rule, because "the retail pharmacist is in most instances unfa-

---

9. In *White* the Pennsylvania Superior Court explained that

> the rationale for th[e learned intermediary] rule is obvious: It is the physician who has the superior knowledge in the circumstances because he or she is able to balance the risks associated with the prescription drug against its utility "in light of his [or her] personal knowledge of the patient's medical history."

562 A.2d at 386 (quoting *Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 307 A.2d 449, 457 (1973)). *See generally* Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability*, 18 Rutgers L.Rev. 947, 987 (1964) (discussing the policies underlying the learned intermediary rule).

10. *See infra* note 18.

miliar with the medical history and condition of the patient-consumer and, in any event, is not a physician, trained in the diagnosis and treatment of diseases." *Id.* Thus, warnings by pharmacists "would be inadequate to enable the average consumer to evaluate the benefits and risks attendant to the use of such drugs." *Id.* at 379.

The Pennsylvania Supreme Court adopted the reasoning of *Makripodis* in *Coyle v. Richardson–Merrell, Inc.* The facts of that case are almost identical to *Makripodis:* the parents of a deformed infant brought a products liability action against the manufacturer of Bendectin and the pharmacy from whom the plaintiffs purchased the drug. In *Coyle,* however, the plaintiffs did not allege that the pharmacy was strictly liable for failure to warn, but rather that it was strictly liable as the supplier of a defective product.[11] The trial court granted summary judgment for the pharmacy, and the Pennsylvania Superior Court and Supreme Court affirmed. 584 A.2d at 1384.

The supreme court refused to impose strict liability upon pharmacists for failure to warn. The plaintiffs' argument, the court said, "g[a]ve scant attention to the rule of *Incollingo* and its rationale." *Id.* at 1386. For, "[u]nder that rule, information about the risks of medicines is provided to the person who most needs and can best evaluate it—the physician—to be shared with and explained to the patient in the context of his or her individual medical circumstances." *Id.*

As the court explained, under the distribution system for prescription drugs, "[p]hysicians exercising sound medical judgment act as intermediaries ..., preempting, as it were, the exercise of discretion by the supplier-pharmacist, and, within limits, by the patient-consumer." *Id.* "[I]t is not the pharmacist on whom the public 'is forced to rely' to obtain the products they need," but rather the physician. *Id.* at 1387. "Physicians act as exclusive intermediaries." *Id.*

We find the Pennsylvania courts' reasoning in *Makripodis* and *Coyle* instructive on whether the learned intermediary rule extends to nurses[12] under Pennsylvania law. Like pharmacists, nurses generally are not capable of providing the degree of individualized medical judgment rendered by physicians, and are not authorized independently to prescribe drugs.[13] This is because nurses are not required to undergo the rigorous medical training necessary to become a licensed physician.[14] As such, we do not believe "the rule of *Incollingo* or its rationale" extends to nurses. *See Coyle,* 584 A.2d at 1386.

To be sure, as the district court observed, nurses often perform tasks "similar to" those performed by physicians, and are therefore more like physicians than are pharmacists. *See Mazur I,* 742 F.Supp. at 255. But these tasks are typically performed under the supervision of, or in col-

---

**11.** As the *Coyle* court noted, "[i]t is not entirely clear in what sense ... the drug was defective beyond that it allegedly carried a risk, of which no warning was given, of causing the child of the pregnant woman for whom it was prescribed of developing with malformed limbs." 584 A.2d at 1386.

**12.** Pennsylvania law recognizes several types of health care professionals, many of which might generically be referred to as nurses. *E.g.,* 49 Pa.Code § 18.6 (1992) (nurse-midwives); *id.* § 18.21 (certified registered nurse practitioners); *id.* § 18.141 (physician assistants); *id.* § 21.145 (licensed practical nurses). We use the term "nurse" here to refer to the "registered nurse," as defined by 63 Pa.Stat.Ann. § 213 (Purdon Supp.1991) and 49 Pa.Code §§ 21.1 & 21.11 (1992).

**13.** The Pennsylvania Nursing Law explicitly excludes from the "practice of professional nursing" "acts of medical diagnosis or prescription of medical therapeutic or corrective measures, except as authorized by rules and regulations jointly promulgated by the State Board of Medicine and the [State Board of Nursing]." 63 Pa.Stat.Ann. § 212(1); *accord* 49 Pa.Code § 21.1. Specialized nurses, like the "certified registered nurse practitioner," may "perform acts of medical diagnosis or prescription of medical therapeutic or corrective measures," but only "in collaboration with and under the direction of a physician licensed to practice in [Pennsylvania]." *Id.* § 21.251.

**14.** *Compare* 49 Pa.Code § 17.1 (requirements for license without restriction for medical doctors) *with id.* §§ 21.21–.23 (requirements for license for certified registered nurses).

laboration with, physicians. For instance, registered nurses may administer drugs to a patient, but only those "ordered for that patient by a licensed doctor." 49 Pa.Code § 21.14 (1992). Likewise, immunization is a "proper function" of the registered nurse, but only if "[a] written order has been issued by a licensed physician," and "[t]he policies and procedures under which the registered nurse may administer immunizing agents ... have been established by a committee representing the nurses, the physicians and the administration of the agency or institution." *Id.* § 21.16.

At bottom it is the physician who is required to make the individualized medical judgment of what treatment to administer in a given instance, and it is the physician who is ultimately held accountable for that decision.[15] Thus, in the distribution system for prescription drugs warnings are directed to physicians and not nurses or pharmacists. "[I]nformation about the risks of medicines is provided to the person who most needs and can best evaluate it—the physician—to be shared with and explained to the patient in the context of his or her individual medical circumstances." *Coyle,* 584 A.2d at 1386.

■ Accordingly, we do not believe the Pennsylvania Supreme Court would extend the learned intermediary rule to nurses. But even assuming there are circumstances in which a nurse may act as a learned intermediary under Pennsylvania law, we do not think it can be said, as a matter of law, that Nurse Frederick acted as a

learned intermediary under the facts here.[16]

The district court found that, based on the "totality of her qualifications and what she did, it is clear that Nurse Frederick was acting as [a] learned intermediary at the time of Lisa's inoculation." *Mazur II,* 767 F.Supp. at 711. It explained:

Nurse Frederick had the required general education, experience, and authority. She had specialized knowledge concerning the proposed treatment to be administered. She had read the Important Information Statement on at least two occasions before the vaccines were administered. She had particularized understanding of measles, mumps, and rubella; their symptoms and complications; and the vaccines intended to prevent them. She knew of the more common side effects of those vaccines. Specifically, she was aware that encephalitis could follow the measles virus and the measles vaccine.... She was an experienced medical professional with specific training as to the vaccine in question. In sum her knowledge of the "palliative" was sufficient. She was knowledgeable as to health issues of school-age children. Parents relied upon her expertise to aid them when they had questions concerning the school health programs and their child's needs. She reviewed the records of the children at the Morrison school and made individualized decisions concerning each of them. On February 26, 1982, Nurse Frederick checked the stu-

---

**15.** As the district court noted, 42 Pa.Cons.Stat. Ann. § 8334(a) (1982) extends a limited grant of immunity from liability to *both* physicians and nurses who administer vaccines in the mass immunization context. Although this provision may be further evidence that physicians and nurses act alike in certain respects, we do not find it dispositive of the issue whether nurses may be learned intermediaries under Pennsylvania law.

As we have noted, courts have formulated different liability rules in the mass immunization context. *See Davis v. Wyeth Lab., Inc.,* 399 F.2d at 131. The principal reason for the so-called mass immunization exception to the learned intermediary rule is that when vaccines are administered under "clinic-like" conditions, it is difficult, if not impossible, to render the type of individualized medical care required of

the learned intermediary. *See id.* Therefore, although 42 Pa.Cons.Stat.Ann. § 8334(a) may be evidence that nurses act like physicians in the mass immunization context, we doubt it reflects a legislative judgment that nurses act like *learned intermediaries* in the mass immunization context. Of course, it remains to be seen whether the immunization program here is within the mass immunization exception. We examine this issue *infra* Part II(C).

**16.** Merck asserts that Dr. Sharrar acted as a learned intermediary as well. For the reasons articulated by the district court, *see Mazur I,* 742 F.Supp. at 253–54, we find this argument untenable. Therefore, we limit our analysis to the question whether Nurse Frederick acted as a learned intermediary.

dents, including Lisa, for visible signs of illness. Ultimately, Nurse Frederick "made a considered medical judgment," and permitted Lisa to receive her MMR II vaccine.

*Id.* (citations omitted). We disagree.

Although Nurse Frederick is unquestionably qualified as a registered nurse, we cannot agree that she possesses the minimum qualifications and experience required of the learned intermediary. Nurse Frederick stated herself that the "emphasis" of her formal education was on "education" rather than "nursing." As part of her training to become a registered nurse, she learned how to administer vaccines. But although Nurse Frederick had some classes in medication, she was never trained in weighing the risks and benefits of vaccination in a given instance. In 1980 Nurse Frederick attended a one-year, nurse practitioner program at the University of Pennsylvania. But this program centered on physical examinations of children, and did not include detailed instruction on immunization or pediatric diseases.

Although Nurse Frederick is experienced in administering and dispensing drugs, she is not authorized to prescribe drugs. When Nurse Frederick dispensed drugs as part of a pediatric course she took at Philadelphia General Hospital, she did so only pursuant to "doctor's orders." As a school nurse, Nurse Frederick may only dispense "tylenol" to children.

Nurse Frederick is capable of describing the symptoms of measles, and is aware that various side effects and complications can result from inoculation with measles, mumps, and rubella vaccines. However, at the time Lisa Mazur was vaccinated, Nurse Frederick was unaware that SSPE is a possible complication of measles vaccine. Moreover, as the district court noted, Nurse Frederick was unable to "state how a virus travels through the body, how a virus causes illness, or how a vaccine prevents illness." *Mazur II*, 767 F.Supp. at 709. Likewise, although she was aware that children running fevers should not be vaccinated, Nurse Frederick was unable to explain why, and said that in such a case she would refer the child to a physician.

Nurse Frederick's only knowledge of the MMR II vaccine was obtained from her participation in the city's immunization program, and, in particular, the Important Information Statement, which she reviewed at least twice. Nurse Frederick does not remember reading the package circular, though she was aware that it came with each vial of MMR II vaccine. Moreover, although she had "access" to vials of MMR II vaccine on the day it was administered to students at the Morrison School, Nurse Frederick said that the "vaccines were not in her hands" and "were entirely managed by the Department of Health Technician." [17]

Accordingly, we do not believe Nurse Frederick possessed the cumulative medical knowledge and experience necessary to make an individualized judgment as to which students should have been vaccinated on February 26, 1982, let alone to recognize the "characteristics" of the MMR II vaccine, determine "the amount of the drug which [could] be safely administered," and assess "the different medications the patient is taking." *See Makripodis*, 523 A.2d at 378. Nor do we think she acted like a learned intermediary that day.

Although Nurse Frederick virtually ran the immunization program at the Morrison School, our focus here is on how she acted the day Lisa Mazur was inoculated. As we have noted, Nurse Frederick took each student's permission form, checked it against her health records, and informed the technician which vaccine to administer. In addition to cross-checking records, Nurse Frederick said that "one of [her] jobs ...

---

**17.** We agree with the district court that, for purposes of determining whether Merck met its duty to warn by providing an adequate warning to a learned intermediary, it is immaterial whether Nurse Frederick actually read the package circular so long as it was made available to her. *Mazur II*, 767 F.Supp. at 712–13. However, the fact that Nurse Frederick may have never reviewed the package circular is relevant to the determination whether she acted as a learned intermediary on the day Lisa Mazur was inoculated, and we must assume at this stage that Nurse Frederick was not familiar with the package circular's contents.

[was] to be kind of eyeballing the boys and girls to see whether they looked ill that day or if there was some reason they should not get the vaccine." She elaborated that, as students passed by her, she examined their "overall appearance," looking for "obvious things" such as signs of lethargy, runny eyes and noses, coughing and sneezing, and, sometimes, asked them how they felt or put her arm around them. Nurse Frederick did not ask students whether they were on medication that day, and does not remember whether she turned any students away because of their "overall appearance."

As the court of appeals observed in *Reyes v. Wyeth Laboratories*, the "choice . . . [of the learned intermediary] is an informed one, an individualized medical judgment bottomed on a knowledge of both

patient and palliative." 498 F.2d at 1276. Nurse Frederick had sufficient knowledge of neither patient nor palliative. As a result, she was incapable of rendering an individualized medical judgment as to which students should be vaccinated. This is not to say that Nurse Frederick did not perform her job on the day Lisa Mazur was inoculated, only that she did not act as a learned intermediary between Merck and vaccinees.

Accordingly, we cannot agree, as a matter of law, that Nurse Frederick acted as a learned intermediary on the facts here.[18] Because we conclude that Nurse Frederick was not a learned intermediary, we do not address at this point whether the package circular constituted an adequate warning.[19] Instead, we must next determine whether Merck was obligated to warn users of the

**18.** The cases in which courts in other jurisdictions have extended the learned intermediary rule to nurses are not to the contrary. *See* text accompanying *supra* note 10. In *Rohrbough v. Wyeth Laboratories, Inc.* the district court applied the learned intermediary rule to a nurse who administered a vaccination to the plaintiff in a public health clinic. The court noted that the plaintiff "did not receive [her vaccination] as a part of a mass vaccination program but after talking with the Registered Nurse who ultimately made a considered medical judgment and administered the shot." 719 F.Supp. at 478. Moreover, the plaintiff in that case neither contended that the nurse was not "sufficiently experienced to be a 'learned intermediary' " nor argued that "she was not apprised of the risks associated with the . . . vaccine." *Id.*

In *Walker v. Merck & Co.* the district court held that the learned intermediary exception applied to nurses under Georgia law. That case involved the administration of the MMR II vaccine to a pregnant high school student as part of a county-wide immunization program similar to Philadelphia's program here. The plaintiff "received [her] MMR II injection from a licensed practical nurse who was aware of the risks associated with MMR II, particularly the risks for pregnant females, and who stated that she had read and understood the circular accompanying the MMR II." 648 F.Supp. at 934. In addition, the nurse who administered the vaccine, who had experience as a licensed practical nurse but no specialized training in vaccination, "stated unequivocally" that "before she administered the vaccine to the plaintiff she explicitly asked her whether she was sexually active and whether there was a possibility she was pregnant." *Id.* at 933.

In finding the learned intermediary rule applicable, the *Walker* court relied squarely on a Georgia Court of Appeals decision, *Singleton v. Airco, Inc.*, 169 Ga.App. 662, 314 S.E.2d 680 (1984), which extended the learned intermediary rule to nurses under Georgia law. The plaintiff in *Singleton* died after developing malignant hyperthermia, a known adverse effect of an anesthetizing agent manufactured by the defendant. The court found the "drug insert warnings adequate for the use of a professional trained in the administration of anesthesia, and that the [defendant was] not in any way responsible for [the plaintiff's] death." *Id.* 314 S.E.2d at 682. Significantly, the nurse who administered the anesthesia to the plaintiff had written a paper on malignant hyperthermia while she was studying to become an anesthesiologist, and "was familiar with the drug inserts and stated that she made a hobby of collecting this information while she was a student." *Id. See also Holley v. Burroughs Wellcome Co.*, 74 N.C.App. 736, 330 S.E.2d 228 (1985) (extending learned intermediary rule to nurse/anesthesiologist under similar facts), *aff'd*, 318 N.C. 352, 348 S.E.2d 772 (1986).

**19.** As we have noted, to meet its duty to warn under the learned intermediary rule, a prescription drug manufacturer must provide an adequate warning to a learned intermediary. *Incollingo v. Ewing*, 282 A.2d at 220. Because we conclude, as a matter of law, that Nurse Frederick did not act as a learned intermediary under the facts here, it is not necessary to decide whether the package circular constitutes an adequate warning. We address the adequacy of the package circular *infra* Part II(D), however, in determining whether Merck satisfied its duty to warn by contractually obligating the CDC to warn users directly.

risks of its MMR II vaccine directly under the mass immunization exception to the learned intermediary rule.

### C.

■ Although it determined that Nurse Frederick was a learned intermediary, the district court assumed, for purposes of argument, that she was not and went on to consider whether the mass immunization exception is applicable here. It found that exception inapplicable, because "there was no evidence Merck foresaw that no learned intermediary would be present at inoculation, the Health Department program was not large enough to be a mass immunization program, and the vaccine was not dispensed to 'all-comers.'" *Mazur I*, 742 F.Supp. at 257. We disagree.

As we have discussed, where vaccine is not dispensed on the basis of an individualized medical judgment but to "all comers at mass clinics," courts in other jurisdictions have held that "it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself, or by obligating the purchaser to give warning." *Davis v. Wyeth Lab., Inc.*, 399 F.2d at 131. The Pennsylvania Supreme Court has yet to address the applicability of this so-called mass immunization exception under Pennsylvania law. However, we assume, for purposes of our analysis here, that it would adopt the reasoning of the mass immunization cases under the appropriate circumstances.[20]

As we have noted, the mass immunization exception is better thought of as one context where a prescription drug manufacturer is obligated to warn users directly of the facts which make its product dangerous. That is, it restores the prescription drug manufacturer's duty to warn users directly, which is satisfied indirectly where the prescription drug manufacturer provides an adequate warning to a learned intermediary, because the rationale supporting the learned intermediary rule buckles where prescription drugs are dispensed without an individualized medical balancing of the risks and benefits to the user. The seminal cases on the mass immunization exception to the learned intermediary rule, *Davis v. Wyeth Laboratories, Inc.* and *Reyes v. Wyeth Laboratories*, are instructive.

In *Davis* the plaintiff contracted polio after being vaccinated for that disease as part of a nationally sponsored immunization program, and sued the manufacturer of the vaccine for, among other things, failure to provide an adequate warning. The jury returned a verdict for the defendant, but the court of appeals reversed on the ground that "the manufacturer [had] a duty to warn the consumer (or make adequate provision for his being warned) as to the risks involved." 399 F.2d at 130.

The *Davis* court explained:

Ordinarily in the case of prescription drugs warning to the prescribing physician is sufficient. In such cases the choice involved is essentially a medical one involving an assessment of medical risks in the light of the physician's knowledge of his patient's needs and susceptibilities. Further it is difficult under such circumstances for the manufacturer, by label or direct communication, to

---

**20.** The Pennsylvania Supreme Court has yet to be presented with a situation where the mass immunization exception would apply. However, it has adhered to the "rule of *Incollingo* [and] its rationale," *Coyle*, 584 A.2d at 1386, the mass immunization exception has been accepted in other jurisdictions, and there is no contrary authority under Pennsylvania law.

In *Taurino v. Ellen*, 397 Pa.Super. 50, 579 A.2d 925 (1990), the Pennsylvania Superior Court held that the manufacturer of Loestrin, an oral contraceptive, was not liable for failing to warn users directly where that drug was dispensed at a women's clinic by an employee who was not a physician. However, this holding was premised on the assumption that the "manufacturer ha[d] no reason to know that this w[ould] occur," *id.* 579 A.2d at 928, and, as we discuss above, the applicability of the mass immunization exception turns on the *foreseeability* that a vaccine will be dispensed without a learned intermediary present. Therefore, *Taurino* is inapposite.

In any event, because we conclude *infra* Part II(D) that Merck satisfied any duty it had to warn users directly by contractually obligating the CDC to warn vaccinees of the risks of its MMR II vaccine, we need not decide the applicability of the mass immunization exception under Pennsylvania law.

reach the consumer with a warning. A warning to the medical profession is in such cases the only effective means by which a warning could help the patient.

Here, however, *although the drug was denominated a prescription drug it was not dispensed as such. It was dispensed to all comers at mass clinics without an individualized balancing by a physician of the risks involved. In such cases ... warning by the manufacturer to its immediate purchaser will not suffice.* The decision (that on balance and in the public interest the personal risk to the individual was worth taking) may well have been that of the medical society and not that of [the manufacturer]. But just as the responsibility for choice is not one that the manufacturer can assume for all comers, neither is it one that he can allow his immediate purchaser to assume. *In such cases, then, it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or obligating the purchaser to give warning.*

*Id.* at 130–31 (emphasis added).

In *Reyes* the court of appeals adopted the reasoning of *Davis* on similar facts. The plaintiff in that case contracted polio slightly more than two weeks after she was vaccinated for that disease at a county health clinic. The vaccine was administered by a registered nurse; no physician was present. The nurse who administered the vaccine said that she read the package circular accompanying the vaccine, but did not warn the plaintiff of the risks of vaccination.

The plaintiff sued the manufacturer of the vaccine for, among other things, failure to warn. The defendant argued that it met its duty to warn by inserting an adequate warning—the package circular—in the vials of vaccine, and that *Davis* was distinguishable because (1) whereas the plaintiff in *Davis* was vaccinated as part of a mass immunization program, the plaintiff in *Reyes* was vaccinated at her parents' request; (2) whereas the plaintiff in *Davis* was vaccinated by a pharmacist, the plain-

tiff in *Reyes* was vaccinated by a "public health nurse"; (3) compared to the defendant in *Davis*, it "played a relatively passive role" in the national immunization program; and (4) unlike the defendant in *Davis*, it "had no knowledge that the vaccine would not be administered as a prescription drug." 498 F.2d at 1277.

The *Reyes* court found the defendant's arguments unpersuasive. Embracing the rationale of *Davis*, the court first observed that "[w]here there is no physician to make an 'individualized balancing ... of the risks,' ... the very justification for the [learned intermediary rule] evaporates." *Id.* at 1276 (quoting *Davis*, 399 F.2d at 131). The court then rejected the defendant's attempt to distinguish *Davis* on the facts presented.

None of the[ ] asserted grounds for distinguishing *Davis* justifies a different result here. The first two arguments are admittedly distinctions between *Davis* and the instant controversy, but they have no bearing on the rationale of the *Davis* opinion. *Whether vaccine was received during a mass immunization program or an on-going program, whether it was administered by nurse or pharmacist, it was, in both cases, dispensed without the sort of individualized medical balancing of the risks to the vaccine that is contemplated by the prescription drug exception.*

The third and fourth asserted reasons for distinguishing *Davis* from this case are essentially the same: [the defendant] took no active part in the vaccination process here, and did not know that its vaccine would be dispensed without procedures appropriate for distribution of prescription drugs. Were we to conclude that [the defendant] neither knew nor had reason to know that its vaccine would be dispensed without prescription drug safeguards, we might be able to hold that the *rationale* in *Davis* is inapplicable here. But [the defendant] had ample reason to foresee the way in which its vaccine would be distributed.

*Id.* at 1277 (emphasis added). The court concluded that the defendant "was required to warn foreseeable users, or see

that the Texas Department of Health[21] warned them." *Id.*

As *Davis,* and particularly *Reyes,* suggest, it is not the size of the immunization program which dictates whether the mass immunization exception is applicable, but rather whether the vaccine was dispensed without an individualized medical balancing of the risks and benefits of inoculation and the foreseeability that the vaccine would be dispensed in this manner.[22] The scope of the immunization program is, of course, relevant to the determination whether it is foreseeable that a vaccine will be dispensed under "clinic-like" conditions, but it is not controlling. Therefore, we cannot agree that the size of the city's immunization program alone, which initially involved a pool of some 300,000 potential vaccinees city-wide, precludes the application of the mass immunization exception here.

We have already determined that the MMR II was not dispensed by a learned intermediary on the day Lisa Mazur was inoculated. Students were led into the gymnasium at the Morrison School and vaccinated in "assembly line" fashion; no individualized medical judgment was rendered as to which students should be vaccinated that day.[23] *Cf. Hurley v. Lederle Lab.,* 863 F.2d 1173 (5th Cir.1988).[24] Therefore, the pertinent inquiry here is whether Merck knew or had reason to know that its vaccine would be dispensed in this manner.

Prescription drug manufacturers are charged with knowledge of the distribution system in which their products are sold. As the *Reyes* court noted:

A drug manufacturer is held to the skill of an expert in his field, and is presumed to possess an expert's knowledge of the arts, materials, and processes of the pharmaceutical business. Included in such expertise must be a familiarity with practices and knowledge common in the drug industry as to distribution and administration of pharmaceutical products.

498 F.2d at 1277 (footnote omitted). *See also Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132, 146 (3d Cir.1973) (noting that

---

21. Like the CDC here, the Texas Department of Health had purchased the polio vaccine from the defendant in *Reyes,* and shipped it to county health authorities for distribution. 498 F.2d at 1270.

22. The cases cited by the district court in which courts have construed the mass immunization exception narrowly are not to the contrary. *See Mazur I,* 742 F.Supp. at 255. As we have noted, in *Walker v. Merck & Co.,* 648 F.Supp. at 934, the district court found that the nurse who administered the vaccine was a learned intermediary. Therefore, it follows that the mass immunization exception was not applicable. *See supra* note 18. Likewise, in *Petty v. United States,* 740 F.2d at 1440 (emphasis added), the court of appeals opined: "The duty to warn is imposed on the manufacturer and in a mass-immunization context, *where there is no learned intermediary,* the duty extends to the ultimate recipient of the vaccine."

23. Merck argues that the mass immunization exception is inapplicable, because about two-thirds of the 300,000 students originally eligible for the city's immunization program had been weeded out by the time the MMR II vaccine was actually administered. However, as the Mazurs point out, these students were excused largely on the basis of an administrative process of elimination. That is, the vast majority of these students were eliminated because of medical records revealing that they had already been vaccinated. With respect to the remaining 100,000 students, or at least those who attended the Morrison School, there was no individualized medical judgment made as to who should be inoculated. Our focus here is on these students.

24. In *Hurley* the recipient of a whooping cough vaccine and his parents sued the manufacturer of the vaccine for, among other things, failure to provide an adequate warning. The plaintiffs contended that the vaccine was administered in "a 'clinic-like' atmosphere," and that the mass immunization exception was thus applicable. 863 F.2d at 1178. The court of appeals disagreed:

We are convinced ... the ... mass immunization exception ... is not applicable. Unlike *Reyes,* here the child's personal physician prescribed the shot, and the vaccine was administered under the supervision of the physician in his office by his nurse. In short, *there is no question whatsoever but that a patient-physician relationship existed before and at the time the immunization was given.* Indeed, Dr. Lanier testified that he had actually examined the child. Moreover, the Hurleys admitted in their complaint that the vaccine was administered under the direction and control of Dr. Lanier.

*Id.* (emphasis added). By contrast, no patient-physician relationship ever existed as to Lisa Mazur at the Morrison School, and no physician was present on the day she was inoculated.

under Pennsylvania law drug manufacturers "must be charged with knowledge of the workings of the distribution system by which they chose to state the dangerous effects of [drugs they manufacture] and the short-comings therein").

Merck sold its MMR II vaccine to the CDC for use by state and local health agencies. Although Merck contractually obligated the CDC to warn users directly, it did not require it to ensure that a learned intermediary would be present. Rather, it gave the CDC the option of seeing that its MMR II vaccine was administered by a physician or providing meaningful warnings to vaccinees. From the beginning, it was apparent that the CDC intended to comply with the duty to warn provision of its purchase contract with Merck by developing the Important Information Statement. The CDC made no attempt to ensure that the MMR II vaccine was administered by a learned intermediary. Indeed, as we have noted, although health care professionals like Nurse Frederick had access to the package circular, no provision was made by either the CDC or Merck to see that they read them. Therefore, we cannot agree, as a matter of law, that there was no reason for Merck to foresee that its MMR II vaccine would be dispensed without an individualized medical balancing of the risks and benefits of inoculation.

Because we believe the MMR II vaccine was dispensed under "clinic-like" conditions on the day Lisa Mazur was inoculated and it was foreseeable that the vaccine would be dispensed in this manner, we conclude that the mass immunization exception is applicable here, thus obligating Merck to warn users of the risks of its vaccine directly. The only question remaining is whether Merck satisfied its duty to warn, as a matter of law, by contractually obligating the CDC to see that its MMR II vaccine was administered by a physician or to provide meaningful warnings to vaccinees.

### D.

■ According to the district court, "Merck is not responsible for Lisa's injuries if it acted reasonably when it contracted with the CDC and relied upon its guarantee that the MMR II vaccine would be administered by a physician or after a meaningful warning had been provided to Lisa or her parents." *Mazur II*, 767 F.Supp. at 701. Because it found that Merck reasonably relied on the CDC to draft the Important Information Statement and disseminate it to vaccinees, the district court held that "Merck exercised reasonable care to be sure the Mazurs were informed directly of the risks of MMR II vaccinations." *Id.* at 708. We agree.

As we have discussed, in *Davis v. Wyeth Laboratories, Inc.* the court of appeals held that, in the mass immunization context, "it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or by obligating the purchaser to give warning." 399 F.2d at 131. *Accord Reyes v. Wyeth Lab.*, 498 F.2d at 1276 (holding that, where no learned intermediary is present, "the manufacturer is required to warn the ultimate consumer, or to see that he is warned"). Although it is clear Merck itself made no effort to warn vaccinees directly, it did contractually obligate the CDC to do so. Therefore, we must determine whether a vaccine manufacturer may meet its duty to warn under Pennsylvania law by obligating the CDC to warn users directly where the learned intermediary rule is inapplicable.

As the district court observed, in *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 903 (1975), a plurality of the Pennsylvania Supreme Court stated that "[t]he duty to provide a non-defective product is non-delegable," and, as we have noted, an inadequate warning renders a product defective. Relying on *Berkebile*, the Mazurs argue that Merck cannot "delegate"[25] its duty to warn under Pennsylva-

---

**25.** The district court drew a distinction between "delegating" one's duty to warn and "assigning" it. *See Mazur I*, 742 F.Supp. at 260 n. 28.

Because we believe *Berkebile* is inapposite for the reasons we express below, we find it unnecessary to explore the difference between the

nia law to the CDC by contractually obligating it to warn users directly. We disagree. *Berkebile* is first, and foremost, a section 402A case, and is inapposite here.

The plaintiff in *Berkebile,* the wife/executrix of a man killed in a helicopter crash, brought suit against the manufacturer of the helicopter under section 402A of the *Restatement (Second) of Torts* alleging, among other things, failure to warn. In discussing the defendant's duty to warn, the supreme court distinguished between the manufacturer's duty to warn in negligence, which is governed by the "reasonable man standard," 337 A.2d at 902 (citing *Thomas v. Arvon Prods. Co.,* 424 Pa. 365, 227 A.2d 897 (1967)), and the manufacturer's duty to warn in strict liability, which is "to provide [adequate] warnings in a form that will reach the ultimate consumer and inform of the risks and inherent limits of the product," *id.* 337 A.2d at 903.

As we have explained, although the Mazurs' failure to warn claims were founded in both negligence and strict liability, Merck's duty to warn is governed by section 388 of the *Restatement* because the MMR II vaccine is an "unavoidably unsafe product." Under that section, Merck has a duty "to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." *Incollingo v. Ewing,* 282 A.2d at 220 n. 8. The commentary to section 388 recognizes that, in certain instances, a manufacturer may meet its duty to warn by entrusting the communication of warnings to third persons.

Comment *l* to section 388 provides:

The supplier's duty is to exercise reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge. *If he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied.* The factors which determine whether the supplier exercises reasonable care by giving this information to *third persons* through whom the

delegation and assignment of duties under

chattel is supplied for the use of others, are stated in Comment n.

*Restatement (Second) of Torts* § 388 cmt. *l* (emphasis added).

Comment n to section 388 provides in part:

Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel.... [I]t is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe. There are, however, certain factors which are important in determining this question. *There is necessarily some chance that information given to the third person will not be communicated by him to those who are to use the chattel. This chance varies with the circumstances existing at the time the chattel is turned over to the third person, or permission is given to him to allow others to use it.* These circumstances include the known and knowable character of the third person and may also include the purpose for which the chattel is given.... [T]he care which must be taken always increases with the danger involved....

*Id.* § 388 cmt. n (emphasis added).

▮ Accordingly, we believe a vaccine manufacturer may satisfy its duty to warn in the mass immunization context by obligating the CDC to warn users directly if it informs that agency of the facts which make its vaccine dangerous and reasonably relies on it to communicate such information to users in lay terms. *But cf. Petty v. United States,* 740 F.2d 1428 (8th Cir.

Pennsylvania law.

1984).[26] The manufacturer's responsibility is continuous, and it must therefore apprise the CDC of any risks it later discovers or, in the exercise of reasonable care, should have discovered. The question whether a vaccine manufacturer reasonably relied on the CDC to warn users directly turns on the foreseeability that vaccinees will not be adequately warned. Because the uninformed use of vaccines can be life-threatening, vaccine manufacturers must be held to a high standard of care where they choose to obligate the CDC to warn users directly.[27]

■ All that remains to be decided is whether Merck satisfied its duty to warn, as a matter of law, under the facts here. To answer this question, we must first determine whether Merck properly informed the CDC of the facts which make its MMR II vaccine dangerous. We focus here on the adequacy of the package circular contained in each vial of MMR II vaccine shipped to the CDC for distribution in the public health sector.[28] Our inquiry is guided by the traditional tort analysis of adequacy of warning.

■ Under Pennsylvania law the determination whether a warning is adequate is a question of law. *Mackowick v. Westinghouse Elec. Corp.*, 525 Pa. 52, 575 A.2d 100, 102 (1990). Adequacy of warnings "should be considered with a view to all the evidence." *Berkebile*, 337 A.2d at 902. Adequacy of warnings is determined on the basis of the information that was known or knowable at the time the cause of action accrued. *Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 307 A.2d 449, 458 (1973). Warnings that meet federal drug labeling requirements are afforded some deference. *White v. Weiner*, 562 A.2d at 383.

In *Mazur I* the district court determined that the package circular was adequate in all respects except for the revaccination statement. Because that "statement provide[d] no information about the potential risks associated with revaccination," the court found that there was a genuine issue of material fact as to the adequacy of the package circular's warning. 742 F.Supp. at 258. In *Mazur II*, however, the court concluded that the package circular, and, in

---

**26.** In *Petty* the plaintiff filed suit against the federal government in negligence and strict liability for, among other things, failure to warn of the risks of a swine flu vaccination he received. The district court found the government liable under Iowa law, and the court of appeals affirmed. Among other things, the *Petty* court rejected the government's argument that it statutorily assumed the vaccine manufacturer's (Merrill–National) duty to warn users directly:

> We recognize that the government has attempted to statutorily assume the duty to warn the vaccinees, however, we do not find that this delegation thereby relieves the manufacturer from liability for any resulting inadequacy of the warning. The duty to warn is imposed on the manufacturer and in a mass-immunization context, where there is no learned intermediary, the duty extends to the ultimate recipient of the vaccine. Delegation of the duty does not, in itself, relieve the manufacturer of its obligation, nor should it insulate the manufacturer from liability for deficiencies in the manner in which the chosen intermediary effectuates the manufacturer's duty. Although on the side lines, Merrill–National is assumed to have had the knowledge of the warning issued and to have had the ability to affect the warning.

740 F.2d at 1440. Because the court found the government's warning, disseminated in the form of an Important Information Statement,

inadequate, it held that Merrill–National was strictly liable for failure to warn under Iowa products liability law. *Id.* at 1441.

Significantly, Iowa law adheres to a formal product/conduct distinction in evaluating failure to warn claims founded in negligence and strict liability. *Id.* at 1440; *see supra* note 8. Accordingly, the *Petty* court formulated Merrill–National's duty to warn under section 402A of the *Restatement (Second) of Torts*. As we have discussed, in the prescription drug context, the Pennsylvania Supreme Court law applies the section 388 duty to warn regardless whether the plaintiff's failure to warn claim is founded in negligence or strict liability. Therefore, *Petty* is inapposite.

**27.** Our analysis here is limited to the situation where a vaccine manufacturer obligates the CDC to warn users directly. We need not address whether it would be reasonable for a vaccine manufacturer to rely on another supplier.

**28.** By focusing on the package circular, we do not suggest that there are not other ways in which a vaccine manufacturer might inform the CDC of the facts which make its vaccine dangerous.

particular, its revaccination paragraph, was adequate as a matter of law based on the state of medical knowledge in 1982, the year Lisa Mazur was inoculated. 767 F.Supp. at 713. We agree with the district court for the reasons it expressed.

We limit our discussion here to the Mazurs' novel challenges to the adequacy of the package circular on appeal. They contend that the package circular improperly recommends the use of the MMR II vaccine for those over the age of eight years, despite the lack of clinical studies establishing that the vaccine could be safely administered to "adults." However, as Merck notes, the Mazurs have not pointed to any scientific evidence (available in 1982 or since then) in the record indicating that the MMR II vaccine poses a greater risk to adults than children.

The Mazurs further assert that the package circular is inadequate because it only contraindicates the administration of the MMR II vaccine for those "receiving" corticosteroids as opposed to those who "recently received" them.[29] But we think it sufficient that the package circular provided that "patients receiving therapy with ... corticosteroids" should not be vaccinated. The package circular's intended audience is not the ultimate user, but rather the learned intermediary. *See Mackowick*, 575 A.2d at 102 ("[W]arnings must be directed to the understanding of the intended user."). Here the package circular was directed to the CDC, who was contractually obligated to develop a meaningful warning for vaccinees or their parents.

Finally, the Mazurs argue that the package circular is inadequate because it gives a "self-serving and overly-technical explanation" of the risk of contracting SSPE from the MMR II vaccine. As Merck points out, however, that portion of the package circular pertaining to the risk of contracting SSPE was taken, almost verbatim, from a 1977 government report on the association between naturally occurring measles, measles vaccine, and SSPE. Moreover, as we have noted, the package circular's intended audience here is the CDC, who Merck contractually obligated to develop a warning in lay terms.

Accordingly, we believe Merck adequately informed the CDC of the facts which make its MMR II vaccine dangerous. The second question is whether Merck reasonably relied on the CDC to communicate this information to vaccinees directly. The focus here is on the foreseeability that the CDC would not honor its purchase contract with Merck, which required it to see that the MMR II vaccine was administered by a physician or to provide meaningful warnings to vaccinees. For purposes of this inquiry, we assume, as we must at this stage, that Mrs. Mazur never received the Important Information Statement.

As we have noted, from the beginning it was apparent that the CDC intended to meet its contractual obligation to warn MMR II vaccinees directly by providing a meaningful warning to vaccinees rather than ensuring that the vaccine was administered by a physician. The CDC developed this warning—the Important Information Statement—based on Merck's package circular, previous studies it had conducted, and its expertise in the field of vaccine safety and administration.[30] The district

---

**29.** In the six-month period leading up to her inoculation, Lisa Mazur suffered from pharyngitis, for which she was treated with the corticosteroid Depo–Medrol and eventually had her tonsils removed. On February 26, 1982, Lisa was no longer being treated with corticosteroids. But the Mazurs maintain she was still in an "immuno-suppressed condition," because of the "long half-life" of Depo–Medrol, and therefore should have been warned of the heightened risk of vaccination caused by her recent corticosteroid use.

**30.** The adequacy of the Important Information Statement is immaterial to our analysis here.

In the first place, as we have noted, we must assume Mrs. Mazur never received the Important Information Statement. Therefore, even if it is inadequate, the Important Information Statement could not have been a proximate cause of Lisa's vaccination. *See Mazur I*, 742 F.Supp. at 259–60. More important, our inquiry here is whether Merck reasonably relied on the CDC to honor its contractual obligation by developing a meaningful warning and disseminating it to vaccinees, not whether the CDC in fact developed an adequate warning and successfully disseminated it to vaccinees. The latter inquiry would only be appropriate under strict liability principles, which, for the reasons we

court concluded that Merck reasonably relied on the CDC to develop the Important Information Statement and disseminate it to vaccinees. *Mazur II,* 767 F.Supp. at 704. We agree.

■ As the district court noted, "Merck initially selected the CDC as the vehicle through which it would provide adequate warnings to consumers because the CDC sold the vaccine to the state and local health organizations, supervised the distribution of vaccines, and had vastly more experience than Merck did in the public health field." *Id.* at 708. Given the resources and funding available to the CDC, as well as its expertise in immunology and public vaccination, we believe Merck's decision to rely on the CDC to warn users directly was reasonable.

As the district court observed:

The CDC is an agency of the Public Health Service of the United States Department of Health and Human Services. It is empowered to conduct studies, evaluations, tests, and emergency programs in order to prevent the spread of disease and to improve public welfare. With respect to vaccines, it plays a vital role in research, development, testing, and distribution. It publishes the *Morbidity and Mortality Weekly Report,* among other reports, studies, and journals, to educate public health and medical professionals about the risks and benefits of immunization.

*Id.* at 706 (citations omitted).

The CDC is also affiliated with the Immunization Practices Advisory Committee, which is responsible for recommending the use of vaccines in the public health sector and comprises representatives from the American Medical Association, the American Academy of Pediatrics, the American College of Physicians, the American Academy of Family Practices, the Department of Defense, the Bureau of Biologics, the National Institutes of Health, and the Canadian National Advisory Committee on Immunization.

Furthermore, Merck carefully researched the CDC before it agreed to sell its MMR II vaccine to the CDC for use in the public health sector. As the district court stated, "Merck based its decision [to rely on the CDC to warn users directly] on its own past experience with the CDC; recommendations from physicians; the Bureau of Biologics, consumer groups; and on conversations with the CDC." 767 F.Supp. at 708. And once Merck made its decision to rely on the CDC,

it monitored the CDC's performance through conversations with these same individuals and others.... [E]ach one of these sources told [it] ... that consent forms and Important Information Statements were being sent by the CDC and, in turn, to parents by local health organizations participating in CDC immunization programs.... Through its regular contact with these sources Merck continually checked the CDC's dissemination efforts. At no time did it appear the CDC was not doing its job.

*Id.*

Perhaps, as the district court noted, "Merck might have been more thorough in its examination [of the CDC]." It could have, for example, "hired an independent contractor to review the CDC's conduct." *Id.* But we are satisfied that Merck reasonably relied on the CDC to warn vaccinees directly on the facts before us, and therefore agree with the district court that "Merck ... could not have foreseen that Mrs. Mazur would not receive an Important Information Statement." *Id. Cf. Walker v. Merck & Co.,* 648 F.Supp. at 935.[31]

have expressed, are not controlling here. This is not to say, however, that the Important Information Statement is altogether irrelevant for purposes of determining whether Merck reasonably relied on the CDC. As the district court observed, its contents may inform our reasonableness analysis in certain respects. *See Mazur II,* 767 F.Supp. at 705 n. 13.

31. In *Walker* the district court held that Merck satisfied its duty to warn, as a matter of law, by entering into the identical contractual provision with the CDC as that here. The *Walker* court's holding, however, is only dictum because it had already found the learned intermediary rule satisfied. *See supra* note 18. Moreover, as the district court observed, the *Walker* court's analysis of the Merck–CDC purchase contract was too

Accordingly, we cannot accept the Mazurs' contention that it was foreseeable that the CDC would "down play" the risks of inoculation with the MMR II vaccine. There is nothing in the record suggesting that the CDC understated the risks of vaccination.[32] Likewise, we cannot agree that Merck's reliance on the CDC to warn vaccinees directly was unreasonable because, given the "practical difficulties of obtaining informed consent from children in a school vaccination clinic setting," it was foreseeable that "some" parents would not receive or heed the Important Information Statement. As we have explained, Merck had a duty to exercise reasonable care to see that vaccinees were informed of the risks its MMR II vaccine. For the reasons we have expressed, we are satisfied that Merck met this duty.

## III.

We conclude that the district court properly granted summary judgment for Merck on the Mazurs' duty to warn claims. Merck's duty to warn is governed by section 388 of the *Restatement (Second) of Torts*. Under that section, Merck had a duty to exercise reasonable care to inform vaccinees of the facts which make its MMR II vaccine dangerous.

Merck could have satisfied this duty by providing an adequate warning to a learned intermediary. However, Nurse Frederick did not, as a matter of law, act as a learned intermediary between Merck and Lisa Mazur on the facts here. And because it was foreseeable that the MMR II vaccine would be dispensed without an individualized medical judgment of the risks and benefits of inoculation, Merck was obligated to warn users of the risks of its MMR II vaccine directly under the mass immuniza-

tion exception to the learned intermediary rule.

Nevertheless, Merck met this duty by contractually obligating the CDC to see that its MMR II vaccine was administered by a physician or to provide meaningful warnings to vaccinees. Merck adequately informed the CDC of the facts which make its MMR II vaccine dangerous, and reasonably relied on the CDC to communicate these risks to vaccinees in lay terms. Accordingly, we hold that Merck satisfied its duty to warn as a matter of law, and we will affirm the district court's order granting summary judgment for Merck.

narrow, because it ignored altogether the issue whether Merck reasonably relied on the CDC to warn vaccinees directly. *Mazur I,* 742 F.Supp. at 261 n. 29.

**32.** As Merck points out, the Important Information Statement provides in part:

Although experts are not sure, it seems that very rarely children who get the[ measles,

mumps, and rubella] vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis), convulsions with fever, or nerve deafness.... With any vaccine or drug, there is a possibility that allergic *or other more common serious reactions or even death could occur.*
(emphasis added).